**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

JOHN DOE,

   **Plaintiff,**

 v.            Case No. _3:21-cv-_201-DPJ-FKB

**UNIVERSITY OF MISSISSIPPI, BOARD OF**
**TRUSTEES FOR THE MISSISSIPPI STATE**
**INSTITUTIONS OF HIGHER LEARNING,**
**UNIVERSITY OF MISSISSIPPI MEDICAL**
**CENTER, GERALD CLARK, PhD., in his**
**individual and official capacity,**
**LORETTA JACKSON-WILLIAMS, M.D.,**
**PhD., in her individual and official capacity,**
**KATIE MCCLENDON, Pharm.D.,**
**in her individual and official capacity,**
**PAMELA GREENWOOD, in her individual**
**and official capacity, MARK RAY, in his**
**individual and official capacity,**
**ERIC HOSPODOR, in his individual and**
**official capacity, and**
**LOUANN WOODWARD, M.D., in her**
**individual and official capacity**

   **Defendants.**

**COMPLAINT AND JURY DEMAND**

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff"), by his attorneys Nesenoff &

Miltenberg, LLP, as and for his complaint against Defendants the University of Mississippi

("UM" or the "University"), Board of Trustees for the Mississippi State Institutions of Higher

Learning ("Board of Trustees"), University of Mississippi Medical Center ("UMMC"), Gerald

Clark, PhD., ("Clark"), Loretta Jackson-Williams, M.D., PhD., ("Williams"), Katie McClendon,

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

1

Pharm.D. ("McClendon"), Pamela Greenwood ("Greenwood"), Mark Ray ("Ray"), Eric Hospodor ("Hospodor"), and LouAnn Woodward, M.D., ("Woodward") (hereinafter collectively referred to as "Defendants"), respectfully alleges as follows:

## THE NATURE OF THE ACTION

1.     This action arises out of an egregious miscarriage of justice against Plaintiff, a Black male, through UM's discriminatory, biased and unjust professionalism and Title IX sexual misconduct processes, carried out by UMMC, through its agents, under a presumption of guilt and resulting in an erroneous outcome which destroyed Plaintiff's well-earned reputation, good name and unlimited career potential.

2.     Plaintiff was a graduate student at UMMC, pursuing his M.D., with bright career prospects. However, these prospects were taken from him when he was wrongfully expelled because he dated a white woman, Jane Roe[2].  In the continuation of a pattern familiar to any student of Mississippi's history or literature, Plaintiff was falsely accused of sexual misconduct, denied due process, presumed guilty without evidence, and physically assaulted by a group of white men "defending the honor" of the woman.

3.     Without sufficient evidence, the University wrongfully expelled Plaintiff for vague allegations of "unprofessional behavior" and then attempted to retroactively justify said bogus dismissal through a flawed and biased Title IX investigation for the *same alleged conduct*. Notably, Plaintiff was not given a hearing or opportunity to defend himself until *after* the determination had already been made in both disciplinary proceedings.

4.     The University's biased Title IX investigator willfully overlooked patently false evidence to avoid discrediting Jane Roe, actively withheld evidence from Plaintiff, manipulated

---

[2] Jane Roe is a pseudonym.

the evidence she did collect  to malign Plaintiff and ignored Complainant's motivation in filing a report to cover up her infidelity to her fiancé.

5.      When Roe made these false allegations, UM swiftly moved to take the actions necessary to remove yet another Black male from the program without due process. UM believed, supported and protected the Caucasian female Complainant at all costs.

6.      As a result of Defendants' imposition of the unwarranted, unconstitutional sanction of dismissal, Plaintiff has sustained economic injuries, the loss of exceptional educational and career opportunities and severe emotional distress.

7.      The investigation and adjudication of Jane Roe's allegations were tainted by UM's well-documented, deep-rooted racial animus, as well as gender bias. The latter bias, permeating Title IX prosecutions nationally, was exacerbated by federal and local pressure to protect female "victims" of sexual violence.  This pressure caused UM to reform policies to take a hard line against male students accused of sexual misconduct.  As a result, Plaintiff was twice deprived of a fair and impartial hearing with adequate due process protections, as mandated by the United States Constitution, for hearings that both resulted in Plaintiff's dismissal from medical school.

8.      Plaintiff therefore brings this action to obtain relief based on claims for violations of the Civil Rights Act of 1964, violation of Title IX of the Education Amendments of 1972, as well as violations of Fourteenth Amendment Procedural and Substantive Due Process, the Equal Protection Clause and Conspiracy.

**THE PARTIES**

9.      Plaintiff is a natural person and a resident of the state of Mississippi.

10.     Defendant University of Mississippi is a federally funded public university with its main campus located in Oxford, Mississippi, along with its principal offices and place of business.

11.     Defendant Board of Trustees for the Mississippi State Institutions of Higher Learning is the governing body of Mississippi's eight public institutions of higher learning, including UM and UMMC, responsible for policy and financial oversight, located in Jackson, Mississippi.

12.     Defendant University of Mississippi Medical Center, the health sciences campus of UM located in Jackson, Mississippi, which houses the University of Mississippi School of Medicine, is the state's only academic health science center which functions as a separately accredited, semi-autonomous unit responsible to the chancellor of UM and through him to the constitutional Board of Trustees of the State Institutions of Higher Learning.

13.     Defendant Gerald "Jerry" Clark is a natural person and, at all times relevant herein, was the Associate Dean for Student Affairs at University of Mississippi School of Medicine.  On information and belief, Clark is a resident of Mississippi.

14.     Defendant Loretta Jackson-Williams is a natural person and, at all times relevant herein, was the Vice Dean at University of Mississippi School of Medicine.  On information and belief, Williams is a resident of Mississippi.

15.     Defendant Katie McClendon is a natural person and, at all times relevant herein, was the lead Title IX Investigator in the instant matter, and also serves as the Associate Dean of Student Services at the University of Mississippi School of Pharmacy.  On information and belief, McClendon is a resident of Mississippi.

16.     Defendant Pamela Greenwood is a natural person and, at all times relevant herein, was the Title IX Coordinator at University of Mississippi Medical Center. On information and belief, Greenwood is a resident of Mississippi.

17.     Defendant Mark Ray is a natural person and, at all times relevant herein, was an associate attorney in University of Mississippi Medical Center general counsel's office. On information and belief, Ray is a resident of Mississippi.

18.     Defendant Eric Hospodor is a natural person and, at all times relevant herein, was an associate attorney in University of Mississippi Medical Center general counsel's office. On information and belief, Hospodor is a resident of Mississippi.

19.     Defendant LouAnn Woodward is a natural person and, at all times relevant herein, was the Vice Chancellor for Health Affairs at University of Mississippi Medical Center and Dean of the University of Mississippi School of Medicine.  On information and belief, Woodward is a resident of Mississippi.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the Constitution and laws of the United States and presents a federal question.

21.     This Court has personal jurisdiction over Defendant University of Mississippi, including UMMC and Board of Trustees, on the ground that it is conducting business within the state of Mississippi.

22.     This Court has personal jurisdiction over Defendant Clark on the ground that he was employed by University of Mississippi Medical Center as Associate Dean for Student Affairs at all relevant times herein.

23.     This Court has personal jurisdiction over Defendant Williams on the ground that she was employed by University of Mississippi Medical Center as Vice Dean at all relevant times herein.

24.     This Court has personal jurisdiction over Defendant McClendon on the ground that she was employed by the University of Mississippi School of Pharmacy as Associate Dean of Student Services at all relevant times herein.

25.     This Court has personal jurisdiction over Defendant Greenwood on the ground that she was employed by the University of Mississippi Medical Center as Title IX Coordinator at all relevant times herein.

26.     This Court has personal jurisdiction over Defendant Ray on the ground that he was employed by the University of Mississippi Medical Center as general counsel at all relevant times herein.

27.     This Court has personal jurisdiction over Defendant Hospodor on the ground that he was employed by the University of Mississippi Medical Center as general counsel at all relevant times herein.

28.     Venue is proper in the Southern District of Mississippi pursuant to and 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in this judicial district and division.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**I.      CHRONOLOGY OF EVENTS**

### A.      Plaintiff Attends UMMC to Fulfill His Promise to Jackson, Mississippi

29.     Plaintiff is a native of Jackson, Mississippi, the son of a Lieutenant Colonel in the United States Army. From a young age, his loving family instilled in him the pillars of education

and professionalism which he has carried with him throughout his time at UMMC.  He came to UMMC to serve his hometown as a treatment provider and to serve as an inspiration for others in his community to rise above a system not traditionally designed for their success.

30.     Prior to matriculating at UMMC, Plaintiff graduated from an elite college with honors and was selected as a Civic Engagement Scholar for his desire to improve the health of communities, evidenced by his altruistic efforts like bringing health screenings to the campus for the first time.

31.     After graduation, Plaintiff took further steps toward his lifelong dream of providing quality healthcare to his hometown community and was accepted to the UMMC Master of Science in Biomedical Science Program, where he graduated at the top of his class with a 3.94 GPA.

32.     Plaintiff quickly proved himself to be the leader UMMC recognized when they rewarded his integrity and accomplishments with a six-figure scholarship.

33.     He was well-liked by a diverse group of his male and female classmates, many of whom were witnesses UMMC's SMIT team would later refuse to interview during their sham investigation.

34.     Nonetheless, Plaintiff's classmates recognized him as a true professional, who improved the classroom learning experience for his peers, took immense pride in his work, remained committed to improving the lives of others and treated everyone with respect.

35.     Plaintiff's diverse group of physician mentors in the UMMC community similarly respect him for his professionalism, dedication to excellence and the calm, compassionate manner he utilized to comfort and care for his patients, and their family members.

36.     In addition to his typically stellar academic performance, Plaintiff found time to organize a bible study group on the UMMC campus with his church community.

37.     He was selected for leadership positions within the neurology specialty interest group and the student wellness group.

38.      Plaintiff, in his short time at UMMC, established himself as a rising star in the School of Medicine.

39.     Plaintiff, as a Black male from Jackson, presented to UMMC with a unique opportunity to serve his beloved community, as well as underserved populations in the Jackson area.  More importantly, Plaintiff was able to act as a source of pride and hope for his neighbors. In his brief time at UMMC, he was the joyful recipient of many smiles, well wishes and explicit "thanks" for his important, prominent role at UMMC.

40.     Ultimately, Plaintiff was punished for being a Black man who dated a white woman.

### B.     Plaintiff's Relationship with Complainant and the Initial Injustice

41.     Unfortunately, Plaintiff became involved with the wrong white woman, Jane Roe. Plaintiff and Roe engaged in a consensual, romantic relationship from January 2019 to April 2019, in which the first-year medical students grew close, shared emotional, intimate conversations and engaged in consensual physical, sexual contact.

42.     The intimacy was complicated by the fact that Complainant was engaged to another man throughout the pendency of her liaison with Plaintiff.

43.     Plaintiff and Complainant began their friendship on January 7, 2019, the beginning of the second semester of their first year of medical school, when Complainant changed seats to sit next to Plaintiff in their class.

44.     The pair grew close over the Spring 2019 semester, from January through early April, first as friends and then, later, as intimate partners.

45.     They sat next to each other in classes, then enjoyed private study sessions, attended social events and shared many a meal together during this time. Their extensive text communications, over multiple devices and platforms contained intimate conversations, flirting and deeply personal revelations.

46.     Complainant informed Plaintiff that she was engaged to be married, however she would often discuss her desire for extramarital relations, volunteer details of her sexual experiences with other men and engage in consensual sexual acts with Plaintiff during study sessions and sleepovers.

47.     Plaintiff and Complainant frequently partook in consensual sexual acts into late March of 2019.  Their intimate exchanges included details of sexual encounters, closely held fears and insecurities as well as the aforementioned flirtatious exchanges, which occurred both in-person and through electronic communications.

48.     While text messaging was their primary means of electronic communication, they also communicated via electronic messaging on social media and video chat via FaceTime.

49.     Complainant told Plaintiff, on numerous occasions, that she wanted to leave her fiancé; Plaintiff and Complainant also discussed being in a relationship beyond their physical intimacy.

50.     Plaintiff, for his part, was clearly taken with Complainant, as he often took her out for coffee, meals and other dates, purchased her occasional gifts, including upon Complainant's request, and often drove her around Jackson.

51.     When they were together, Complainant was often the aggressor; she flirted excessively and frequently initiated sexual contact with Plaintiff.

52.     Complainant would then grow guilty, insecure and/or frustrated with her own infidelity and, in response, threaten Plaintiff, argue with Plaintiff and bully him.

53.     Plaintiff often served as Complainant's confidante/therapist and, later on, as her punching bag when she would lash out on him with abusive or insulting text messages, presumably due to feelings of guilt, insecurity or fear.

54.     Complainant would typically apologize for this erratic behavior shortly after her electronic communication tirades, and often informed Plaintiff he did nothing wrong, whilst proclaiming she needed to be accountable for her own actions.

55.     Complainant sent multiple text messages in March, and early April 2019, in which she informed Plaintiff she wanted to be friends or avoid the "complicated" parts of their relationship.  Plaintiff would repeatedly inform Complainant that he was happy being "friends" and act in accordance with these wishes; however, Complainant would engage in flirtatious, and/or sexual behavior, to entice Plaintiff to reciprocate after the text exchange.

56.     All of the aforementioned patterns and communications were memorialized in text messages Plaintiff preserved and provided to UMMC during the subject Title IX investigation.

57.     Complainant struggled with her infidelity and, in early April 2019, was overcome with feelings of guilt for cheating on her fiancé.

58.     As a result, Complainant made egregious, false allegations of sexual assault and sexual harassment against Plaintiff.  She did so to cut off her relationship with him, get him kicked out of school and prevent people, including her fiancé, from finding out about her transgressions.

59.     Complainant embarked on a smear campaign against Plaintiff, spreading rumors of her egregious false allegations to her friends at UMMC.

60.     On April 8, 2019, two of complainant's classmates presented to Defendant Clark's office on complainant's behalf: her fiancé's friend, Sam G. ("Sam"), and Karam R. ("Karam") (collectively referred to as "Clark's barricade").

61.     Notably, Clark was a personal advisor to Complainant for over seven months before April 2019 through the Academic Achievement Program, which was for medical students who struggled with the rigors of the program in the fall semester. As a result, Clark was compromised with a glaring conflict of interest which warranted an immediate, absolute recusal from the matter the moment he was notified of Complainant's allegations against Plaintiff. Instead, he involved himself in every step of Complainant's false plot to do away with Plaintiff in order to avoid responsibility for her infidelity.

62.     Sam and Karam informed Clark of Complainant's (false) accusations that Plaintiff made unwanted sexual advances in March 2019 and sexually harassed her in April 2019. While spreading her vicious rumors, however, Complainant, of course, left out the details of her and Plaintiff's months-long romantic relationship and intimate friendship which lasted until early April.

63.     Upon hearing the allegations, Clark, without first speaking to his mentee, contacting Plaintiff or investigating the secondhand claims, feared for Complainant's safety due to the fact that Plaintiff was a Black male, and arbitrarily deputized Sam and Karam as Complainant's personal bodyguards, directing them to form a barricade between her and Plaintiff.

64.     The following day, Complainant met with the UMMC Title IX coordinator Pamela Greenwood and her deputy coordinator, Chris Morgan, to formalize her lies in an official Title IX complaint.

65.     On April 11, 2019, Plaintiff, without yet being advised of the false and defamatory allegations against him, approached Complainant prior to their class starting.

66.     Complainant was sitting behind the front row of desks in the lecture hall, and Plaintiff engaged in a calm, quiet and respectful conversation in which Complainant, for the first time, informed Plaintiff she was no longer interested in pursuing a friendship with him.  He did not sit next to her and stayed a respectful distance from Complainant throughout the interaction.

67.     The conversation concluded among the many student-eyewitnesses who were shuffling in and out of class. Notably, these eyewitnesses were *never interviewed*. Karam then approached Complainant and abruptly stated, "Let's go to the Dean's office."

68.     Plaintiff observed Complainant leave, and then return with her newly deputized bodyguards, Clark's barricade.  Plaintiff then went by himself to Clark's office.

69.     Plaintiff calmly recounted his interaction with Complainant up to and including Karam's aggressive intrusion into the exchange.   Plaintiff informed Clark that he and Complainant would no longer pursue a friendship.

70.     As he returned to class, amid suspicious, and antagonistic glares from Clark's barricade, Plaintiff received a text from his good friend and confidante, "Sara".

71.     Sara urged him to return to tell Clark of the romantic aspect of their relationship, because she was rightfully suspicious of Complainant's adulterous behavior.

72.     Plaintiff also spoke with his close friend, "Rachael," who provided similarly sage advice and support.

73.     Plaintiff, alarmed by the glares of Sam and Karam, took his friends' advice and returned to Clark's office for a second conversation.  Plaintiff informed Clark of the romantic relationship, and explained he wanted to give Clark the complete, nuanced picture.

74.     Notably, Clark never told Plaintiff that an official Title IX complaint had been made against him, or that, as part of a story as old as the University's racism, Clark directed Sam and Karam to keep an eye on Plaintiff and protect the "innocent" white woman from the threatening Black man.

75.     After leaving Clark's office, Karam and Sam accosted Plaintiff in the hallway outside his classroom. Karam insulted Plaintiff; he called him "weak", "scared" and "soft." Plaintiff informed Clark's barricade that they were misinformed, and attempted to walk back into the classroom to diffuse the situation.

76.     The drama continued as Sam proceeded to block Plaintiff's entry to the classroom. Plaintiff attempted to peacefully avoid the hostile, improperly emboldened students, but Sam forcefully pushed Plaintiff against the wall, causing a large noise overheard in two lecture halls.

77.     Karam then approached Plaintiff from behind and applied a wrestling submission hold.  He pulled Plaintiff's arms up behind his head and attempted to pull him into the hallway. Plaintiff was thrown to the ground.  After being attacked by Clark's barricade, Plaintiff, anxious and afraid, stepped outside to call his mother and calm down.

78.     While standing outside an entrance to the academic building, after being attacked by his fellow students, Plaintiff was next approached by UMMC campus police, Officer Alford and Sargent Jenkins, who demanded Plaintiff's name, role at UMMC, and identification.

79.     The campus police also felt it was necessary to pat the model medical student down, in front of his mother, who had come down to campus to support her loving son, an enduring source of pride to his family and the community, after he was attacked by Clark's barricade.

80.     Unfortunately, there would be no consequences for the attack by Clark's barricade. Clark, for his part, was far more concerned with protecting himself and his mentee's, the Complainant's, fabrication.

81.     Clark then arrived at the scene he helped create with his bias, and immediately directed campus police to remove Plaintiff from campus without providing even minimal due process procedures enumerated in the UMMC student handbook. Clark threatened Plaintiff with dismissal from UMMC and arrest should he return to campus. Notably, at this point Plaintiff had *still not been advised that there was a Title IX complaint against him*.

82.     Clark, in an effort to conceal his biases, prejudice and clear conflict of interest, would later allege he felt Plaintiff was a "safety risk" and danger to the community, *despite the fact that Sam and Karam were the ones that assaulted Plaintiff*. Significantly, Sam and Karam, who are on information and belief, Caucasian males, were not disciplined for assaulting Plaintiff.

83.     Not only did Clark display his racial animus in his arbitrary disciplinary decisions, but he went so far as to *suppress video surveillance footage* of Sam and Karam's attack on Plaintiff in order to cover up the fact that Plaintiff had done nothing wrong.

84.     Likewise, Clark instituted a unilateral "gag order," directing Plaintiff not to speak with anyone from the campus community, which prevented Plaintiff from recruiting some of the exculpatory eyewitnesses to aid in his defense. Neither Complainant nor Clark's barricade were directed to cease their communications.

85.     Thus, enabled by Clark, Complainant, Sam, and Karam engaged in an extensive smear campaign, defaming Plaintiff prior to, throughout and after the subject school discipline. Frequently contradicting themselves, the white students were empowered to declare a multitude of lies as truth, with the administration taking their shifting stories at face value.

86.     Sadly, April 11, 2019, was Plaintiff's last day in the medical school at UMMC, as his noble dreams of serving his community came crashing down under suspicious circumstances that could only be created by conflicted, biased administrators with nefarious motives.

## C.     Professionalism Charges Adjudicated Covertly Resulting in Unjust Expulsion by Conflicted Dean Williams

87.     On April 16, 2019, Plaintiff received a letter from Defendant Williams advising Plaintiff that the Dean's Council met, in violation of UMMC's policies, *without notice to Plaintiff*, and decided to dismiss him for alleged repeated instances of unprofessional behavior.

88.     Notably, Williams, prior to dismissing Plaintiff, explicitly told others she "hated" Plaintiff. She was overheard making additional derogatory comments about him by multiple witnesses on separate occasions.

89.     There was a complete lack of due process prior to Plaintiff's dismissal. The Dean's Council, consisting of Defendants Clark, Williams and LouAnn Woodward, Vice Chancellor and Dean of the School of Medicine ("Woodward"), relied on unsupported, defamatory allegations to dismiss Plaintiff without investigating the claims, serving formal notice of the charges or providing Plaintiff with a meaningful opportunity to defend himself.

90.     As stated in Williams' letter, the Council relied on complainant's lies and a 2018 email from UMMC employee Emma Liston alleging admittedly innocuous touching, which, notably, Clark previously brushed off and informed Plaintiff that it was 'not a big deal.'[3]

91.     Plaintiff had no knowledge of the allegations that were considered by the Dean's Council and had no opportunity to defend himself.

92.     The arbitrary and capricious decision of the Dean's Council reeked of ulterior motives, conflicts of interest and the abhorrent racism.

93.     Notably, that same day, Plaintiff was notified *for the first time* of the Title IX complaint against him, only *after* he had already been dismissed from the University.

94.     After receiving the April 16, 2019 dismissal letter, Plaintiff attempted to obtain information about the unwarranted dismissal, after his colleagues inquired about the omnipresent, loud character assassination and the professional death sentence executed by Clark and Williams.   Plaintiff's classmates heard rumors which were broadcast from the bowels of social media to the Jackson campus by complainant and the emboldened, deputized barricade, as well as their friends and associates.

95.     Clark refused to speak with Plaintiff after banning him from campus, and further directed Plaintiff that he could not speak to anyone within the school community via a gag order to prevent access to the numerous eyewitnesses and exculpatory evidence relevant to his defense.

96.     Williams only spoke to Plaintiff after multiple unanswered calls, between April 11, 2019 and April 16, 2019, and even then, she provided unabashed lies and bureaucratic equivocation.

---

[3] Liston complained of Plaintiff's inadvertent touching of her arm in an elevator and classroom, but noted it was 'quite possible' Plaintiff was unaware of the allegedly offending conduct.  When Clark briefly mentioned Liston's emailed allegations to Plaintiff, he explicitly stated, "I don't want you to be concerned.  This isn't something you should worry about.  I, too, have to watch myself to avoid people getting the wrong idea."

97.     Plaintiff inquired why he was dismissed, while the students who accosted him, Sam and Karam, received no consequences for their unprovoked attack.

98.     Williams claimed the April 11, 2019 assault was not the reason for the dismissal, but rather that the dismissal was based on Complainant's allegations, as well as the aforementioned innocuous allegation by Liston.

99.     Incredibly, Williams also stated, incorrectly, she was not responsible for investigation of the professionalism claims, because "that is not what we do in the school." She, again, claimed the dismissal was "preliminary", and further admitted she dismissed him without due process. The admission was as damning as it was true.

100.    Williams successfully attempted to pass the buck to campus police throughout, alleging they were investigating the matter. The police, however, actively avoided interviewing Plaintiff until *after* the April 16, 2019 dismissal by the Dean's Council.  Notably, Plaintiff was unable to make a report with UMMC police about Sam and Karam's assault on him prior to the Dean's Council's decision. He attempted to do so, however the campus police would not take a report until after the professionalism proceeding was appropriately fixed by Williams and Clark.

101.    In reality there was no legitimate investigation done in this matter. This was a coordinated, willful sham process, because the outcome was preordained (dismissing the Black student who was dating the white female student).

102.    Plaintiff appealed the Dean's Council's decision, and Plaintiff was granted an appeal hearing, which took place on May 3, 2019. Notably, the night before the hearing, Plaintiff was, for the first time, provided with other unsubstantiated and provably false allegations from another student, A.M. McDonnell ("McDonnell"), that had been considered by the Dean's Council in making the decision to dismiss Plaintiff.

103.     Additionally, Defendant Ray intentionally withheld relevant information concerning Sam and Karam's assault until the last possible moment. He waited until approximately 6 p.m. on May 2, 2019, the evening before the professionalism appeal panel, to email the information to Plaintiff's advisor, which included a responding officer's report, Sam and Karam's false statements to the police and emails to Clark.

104.     Ray's provision of this information less than twenty-four hours before the hearing successfully prevented Plaintiff from calling appropriate witnesses or collecting exculpatory evidence to refute the false allegations.  Plaintiff could not prepare a meaningful defense.

105.     Though Plaintiff had significant interests at stake on appeal (Plaintiff's education, medical degree, six-figure scholarship, research grant, professional memberships, future and career prospects), he was further deprived of due process.  The presiding appeal panel included the *same biased decisionmakers*—the Dean's Council—who wrongfully decided to dismiss Plaintiff.  He was not given appropriate notice of the hearing, full access to the evidence, the opportunity to call his own witnesses or, incredibly, the right to cross-examine the opposing, complaining witnesses.

106.     The professionalism appeal panel hearing was a mere formality as Clark and Williams, with the subordinate dean, Norris, ensured no real evidence would thwart their plans to dismiss Plaintiff.  They rushed the dismissal, with full knowledge that Title IX was investigating the very same allegations proceeding before the panel and ignored video evidence that would have cleared Plaintiff.

107.     In addition to the lack of cross-examination of his accusers at the professionalism hearing, Plaintiff was prohibited from submitting evidence on his own behalf.  He provided over a dozen letters to Williams that were written by colleagues, students and physicians, attesting to

his professionalism.  Williams willfully withheld this relevant evidence from the panel, much like she withheld the Plaintiff's campus police report from the panel and ensured Plaintiff did not see any police reports against him until the night before the appeal panel hearing.  Despite this willful lack of notice, and late disclosure to prevent a meaningful defense, Williams admitted the police reports against Plaintiff revealing her biased, wicked commitment to dismissing him.

108.    Defendant Williams admitted there was no investigation performed by UMMC prior to Plaintiff's dismissal.  The Dean's Council simply believed the white female complainants, with the false narrative bolstered by Clark. Williams could barely hide her own disdain, and clear bias, when she admitted her own statements to the professionalism panel.  She disingenuously criticized Plaintiff's stellar academics and his interest in research grants[4].

109.    Additionally, Defendant Hospodor acted unprofessionally at the professionalism panel, slouching and sighing his way through the hearing, acting as a distraction and overtly disrespectful to Plaintiff. As general counsel for the University, Hospodor was in a prominent position, known by the panel members.  Unfortunately for Plaintiff, it was reasonable for the panel members to take their cues from the representatives of the University General Counsel's office.

---

[4] In contrast to Williams' critical comments about Plaintiff's academics, the person she referred Plaintiff to meet with about academics, Dr. Penni Smith Foster ("Dr. Foster"), said that Plaintiff had some of the best study strategies that she had ever seen from anyone. Dr. Foster does not work in the Dean's office; instead, she is an academic consultant, the director of the Office of Academic Affiliations, and a professor at the medical school. Dr. Foster had Plaintiff complete an assessment on study habits and email it to her. Dr. Foster provided this helpful information to Williams, yet Williams was still disingenuously critical of Plaintiff's performance as a student. Further, Williams withheld Dr. Foster's positive, objective assessment of Plaintiff's academics and study habits from the professionalism panel. Williams ensured her own negative (and more subjective) remarks about Plaintiff's academics and research interests prevailed.

110.    Plaintiff lost the appeal, because Clark and Williams rubberstamped their own Dean's Council decision dismissing Plaintiff from UMMC.

111.    As such, the UMMC conspirators, Williams and Clark, with the campus police at their disposal, accomplished their unconstitutional goal.  The professionalism appeal panel only reviewed police paperwork against Doe.  Plaintiff's side of the story was therefore never investigated and, in fact, actively withheld from the appeal panel.

112.    The May 3, 2019, professionalism appeal panel was a farce till the end, and further insult to due process.  As a final indignity for Plaintiff, Williams refused to provide Plaintiff with the reasoning behind the professionalism appeal panel's decision to uphold the dismissal.

113.    Williams likely struggled to do so because there was no reasoning to support their decision.  Similarly, there was no evidence, fairness or integrity, present in the Dean's Council. The dishonorable deans controlled the Dean's Council, with their glaring conflicts of interest, emboldened by the University's history of cruel, unchecked racism.

### D.    UMMC Police Participate in Deprivation of Plaintiff's Constitutional Rights

114.    The campus police, for their part, actively avoided investigating the assault of Plaintiff, because UMMC wanted to control the investigation, or lack thereof.  Williams claimed the deans were relying on the police investigation, while the police claimed they were proceeding on the dean's timeline.  The back and forth was orchestrated to delay taking Plaintiff's report.

115.    Prior to Williams' conspiring with the campus police to stall their investigation, and cease communications with Plaintiff until after his dismissal, the campus police engaged in a far-too-common interaction in this country.

116.    As stated above, campus police detained Plaintiff on April 11, 2019, after he was assaulted by Clark's barricade.  They seized Plaintiff, patted him down in front of his mother and then trespassed him out upon Clark's instructions.

117.    The campus police officers, Officer Alford and Sergeant Jenkins, instantly believed Complainant, and Clark's barricade, because the students were white, like the responding officers and Clark.  While Complainant, Sam and Karam were all offered police escorts to make them feel safe, the detaining officers warned Plaintiff he was not permitted to come onto campus.  It was clear Plaintiff was immediately presumed guilty of all allegations against him.  This is especially despicable given the fact the police officers were aware of the means of obtaining definitive, exculpatory evidence in support of Plaintiff.

118.    As Officer Alford noted in his report on April 11, 2019, UMMC had three (3) cameras "in the area" where the assault occurred and he further noted Sargent Jenkins would check the cameras.  Upon information and belief, the cameras were checked, the video revealed Plaintiff was the victim of the assault, the UMMC agents knew this, still proceeded against Plaintiff and willfully permitted the deletion of the exculpatory videos.

119.    The video was ***destroyed***, even though Plaintiff repeatedly requested a copy of same.  This, combined with the conspirators' refusal to take Plaintiff's statement until after the covert professionalism charges were decided, evidences an intentional avoidance of the truth and clear spoliation on the part of UMMC.

120.    UMMC did not want to preserve the proof Plaintiff was assaulted by the white students, as it would prevent Title IX from generating the sham, unjust, process described further below.  The police did not allow Plaintiff to speak with them until after Williams pushed through

the unconstitutional dismissal.  When Plaintiff was able to speak with an officer, after getting evidence against the students, a supervisor came in to shut down the interview.

121.    Williams was right when she told Plaintiff she provided no due process to him.  The same can be said for Clark, UMMC, in general, and the Title IX agents.

122.    The Title IX investigation, and a second sham hearing, were more of the same: an unjust mockery of due process.

123.    Plaintiff was sadly expelled on April 16, 2019 on the professionalism charges, but UMMC realized at least some investigation was needed to manufacture support for the unsupported dismissal of Plaintiff.


**E.    The Title IX Sham Proceeding to Cover Up the Professionalism Farce**

124.    Plaintiff was notified of Complainant's Title IX complaint against him on April 16, 2019, *after* he had already been dismissed from the University on professionalism grounds.

125.    As such, the University felt so strongly as to embark on a 4-month-long investigation and adjudication of the very same allegations *that were already addressed* in the professionalism proceeding. Notably, Plaintiff was not a "student" at the time the investigation was commenced, due to the fact that he had already been dismissed.

126.    The discrimination, however, was omnipresent at UMMC for Plaintiff, much as it has been for several decades.  While racial discrimination has a well-documented history at the University of Mississippi, Plaintiff was also subjected to the more recent phenomenon of gender bias by the Title IX team.  Members of Title IX, most notably Defendant McClendon, the assigned Title IX investigator on the case, her Sexual Misconduct Investigation Team ("SMIT") and Title IX Director, Defendant Greenwood, actively ignored Complainant's ever-changing

allegations, and obvious credibility concerns, to retroactively justify the professionalism dismissal and manufacture a second unconstitutional dismissal.

127.    Notably, McClendon was not fit for her role as an investigator because she is clearly biased against men. McClendon is a self-described "Feminist" according to her Twitter profile, and consistently established, through her words and actions, that she is incapable of serving as a neutral, unbiased investigator for sexual misconduct investigations.   McClendon's words and actions revealed her gender bias and rendered her generally unfit for participation on the SMIT. Such evidence of bias includes, without limitation:

   a.    McClendon does not take her role as a neutral sexual misconduct investigator seriously.  She laughed at Plaintiff on multiple occasions during the subject Title IX investigation, and showed a general indifference to providing a prompt, thorough and fair investigation in the instant matter.

   b.    On November 13, 2014, McClendon tweeted that she "just learned hearings are needed within 60 days. 100% sure 2 years is greater than 60 days."  This tweet would prove unfortunately prescient as McClendon had no interest in adhering to the 60-day rule, or many of the rules in accordance with the Title IX policy.  She would later tell Plaintiff his hearing would not take place expeditiously, with little concern, as she was going on vacation.

   c.    McClendon has made numerous public statements, on her social media accounts, in which she defiantly supports the notion that all women who make accusations against men should be automatically believed, including a statement that she believed the women who accused Senator Al Franken.

   d.    More troublingly, McClendon shared the statement "innocent until proven guilty is only for criminal convictions."  The SMIT investigator should know, and receive training on the fact, that respondents are shielded with a presumption of innocence in Title IX matters, in accordance with applicable Title IX guidance and specifically under UMMC's own sexual misconduct policy.

   e.    McClendon performed in a production of the Vagina Monologues, a play by Eve Ensler that focuses on women empowerment.

23

    f.   McClendon donates annually to the Mississippi Foundation for Women.  As a former board member, she participates in the organization's events and ensures, with Dr. Woodward, UMMC Office of Diversity and Inclusion is a corporate donor for the organization.

    g.   McClendon informed Plaintiff that the Title IX process he suffered through was required as a condition of money the University received from the federal government.

128.   McClendon's biases were on full display in the instant matter as she served as the lead investigator of the assigned SMIT and, as described further below, would also serve as the lead prosecutor at the Title IX appeal hearing, disregarding school policy in bringing the charges against Plaintiff on behalf of complainant.

129.   In general, the subject Title IX investigation, decision and appellate hearing were, much like the professionalism panel, nothing more than an administrative Three-Card Monte scam in which Plaintiff's rights were wholly disregarded.

130.   Upon information and belief, the Title IX matter was only brought, after Plaintiff was already expelled from campus, in order to retroactively justify and cover up for the farcical injustice of the professionalism panel.

131.   Greenwood ignored UMMC's own protocols when she failed to immediately initiate a formal Title IX investigation.  Greenwood allegedly received the complaint on April 8, 2019, from Clark, but did not conclude her investigation until April 16, 2019, when she notified Plaintiff that she was initiating a formal investigation.

132.   Moreover, Title IX refused to investigate, or even include the April 11, 2019 assault by Sam and Karam in the matter, despite including them as witnesses at the hearing. Like the professionalism panel, the administrators were keenly aware they were the assailants and unjustly intended to keep the punishment focused on Plaintiff.

133.    On April 23, 2019, Plaintiff first met with Greenwood and Ray, from the General Counsel's office.  The initial meeting with Title IX was not at UMMC, but at the law office of Thomas Whitfield, UMMC's outside litigation counsel.  UMMC Police were present at Whitfield's law office to further intimidate Plaintiff.

134.    Greenwood and her counsel were unabashedly adversarial to Plaintiff.  Greenwood again deviated from UMMC policy and avoided disclosing complainant's accusations to Plaintiff prior to this initial meeting.

135.    Defendant Ray began the conversation with an implied threat to intimidate Plaintiff. Ray asked Plaintiff's advisor, Lawrence Blackmon, "Do you practice in criminal law, Lawrence?" Ray, with campus police officers seated nearby, was indicating that it would be necessary for Plaintiff to have criminal defense representation, in addition to an advisor for the Title IX investigation.

136.    Shortly after Ray made his intentionally threatening comments, the initial Title IX meeting was cut short by Plaintiff's advisor because Greenwood was also blatantly adversarial, aggressive and coercive in her questioning of Plaintiff.

137.    The initial meeting was, unfortunately a good prognosticator for the remainder of the Title IX proceeding.  Plaintiff was presumed responsible throughout, with no chance to defend himself in the biased, sham cover-up of a school disciplinary proceeding.

138.    The biased investigators of the SMIT unit, led by McClendon, conducted a one-sided, controlled investigation, that favored the female complainant completely. The SMIT investigators met with complainant *three times*, as compared to Plaintiff's one chance to provide his side of the story.

139.    Plaintiff appeared for his sole interview with McClendon on May 20, 2019. McClendon only focused on complainant's fantastical claims of unwanted sexual advances from March 2019, which were so incredible and contradicted by extensive communications of the parties, that even the outwardly biased investigator could not find him responsible for same.

140.    Plaintiff was prevented, however, from discussing at length the sexual harassment claims for April 2019, for which he had similar exculpatory evidence and reasonable explanations to put certain communications in context. As a result of McClendon's filtering of evidence, Plaintiff was deprived of the opportunity to defend himself.

141.    Plaintiff provided the investigators with the name of several witnesses, all of whom would support his defense.  McClendon did not interview a ***single*** witness Plaintiff requested, opting to stick with the witnesses who assaulted Plaintiff and were willing to lie on Complainant's behalf.

142.    McClendon also avoided conducting meaningful interviews of Liston and McDonnell, the two females Clark recruited, and Williams relied upon, for the professionalism panel determination.  McClendon did not investigate the motives of Clark or his recruits, but relied upon the false allegations to support their finding of sexual harassment. Her job was to cover-up the sham professionalism adjudication, not reveal the truth.

143.    McClendon exemplified all of the failings of the single-investigator model, as she was able to manipulate the proceedings throughout. In addition to the above witness cherry-picking and evidence tampering, she was wholly adversarial to Plaintiff and explicitly refused to interview a key eyewitness, Sara, named by Plaintiff as someone with first-hand knowledge of the incidents in question.

144.    In late May 2019, when Plaintiff inquired as to how long the process would take, and noted the length of the investigation to date, McClendon simply shrugged him off, and told him she "was about to go on vacation and couldn't help him with that."

145.    McClendon treated the Title IX process as another opportunity to empower women in totality, regardless of consequences. McClendon exhibited favorable treatment to the female complainant in both the investigation, and in reaching her biased, unsupported finding in the SMIT investigation report.

146.    On or around June 27, 2019, Plaintiff received notice that he was found responsible for sexual harassment for the alleged unwanted contact of complainant by Plaintiff in April of 2019. Even the biased unit, however, was unable to find Plaintiff responsible for the physical sexual assaults as alleged by complainant in March 2019, because the evidence, namely text messages provided by Plaintiff, was overwhelmingly in Plaintiff's favor.

147.    The determination was made *without a hearing* and without any opportunity for Plaintiff to defend himself.  Critically, Plaintiff had not even received the investigation report at the time he was found responsible.

148.    On June 29, 2019, Plaintiff requested an appeal hearing in accordance with the Title IX policy of UMMC.

149.    On July 23, after two weeks of Plaintiff making repeated requests for information to prepare for the appeal hearing, Greenwood emailed Plaintiff stating "We are attempting to schedule the Hearing at a time that is convenient for all parties.  We anticipate the Hearing to be set in the middle of August. You will be given ample notice and time to review all relevant information." Notably, "middle of August" was when the next school year was slated to start.

Clearly, the unexplained delay was meant to preclude Plaintiff from continuing in his medical education, whether at UMMC or elsewhere.

150.    On August 7, 2019, nearly *four months* after the Title IX process began and only one week before the Title IX appeal hearing, Greenwood emailed Plaintiff information regarding the hearing and investigative report, with evidence.  This was Plaintiff's first opportunity to see the SMIT investigative report and evidence, *after he had already been found responsible.*

151.    Significantly, the report stated, for the first time, very detailed accusations of sexual assault and harassment. These accusations came from written statements that Greenwood requested Complainant, Sam, and Karam to write up and submit to her office after their interviews. The same was not asked of Plaintiff or his witnesses.

152.    However, Greenwood did not produce these written statements for the final report because they contained stark inconsistencies that could have been used to impeach witness credibility at the Title IX hearing.

153.    The Title IX appeal hearing was held August 15, 2019.  Much like the Title IX investigation, and the professionalism adjudication, the hearing was a biased, unjust affair in which Plaintiff's rights were wholly ignored.

154.    The hearing consisted of a show of force to intimidate Plaintiff, who was offered no support services.  This intimidation tactic included the presence of two university associate attorneys, Ray and Hospodor, a paralegal, the Title IX hearing officer, three panelists, and the Title IX Director.  Upon information and belief, the hearing officer was UMMC's outside counsel, Mr. Thomas Whitfield, who is not a university employee or Title IX administrator.

155.    Whitfield was plainly unaware of proper Title IX protocols as he failed to maintain order and permitted the classless complainant to continuously make facial and hand gestures

throughout the hearing which were disrespectful to Plaintiff.  Whitfield added his own disrespect to his client's proceedings as he repeatedly mispronounced Plaintiff's name throughout the hearing.

156.    Greenwood, for her part, oversaw the show of force and sham hearing.  Greenwood sat with the panelists and advised them throughout the hearing.

157.    Plaintiff was present at the hearing, while complainant appeared via screen remotely. She sat with both of her support people, one actual advisor assigned by UMMC and, shockingly, McClendon, who clearly took the position of Complainant's personal protector, advocate and prosecutor.

158.    Unbelievably, *after already finding Plaintiff responsible for sexual harassment*, McClendon was permitted to serve as both a 'prosecutor,' as fittingly labeled by Whitfield, and as one of Complainant's advisors/representatives at the hearing. McClendon presented the matter to the Title IX appeal panel.

159.    McClendon controlled the investigation completely, considering, framing and manipulating evidence and witnesses in the light most favorable to the female complainant. McClendon secured the conviction of Plaintiff by presenting her report to the Title IX panel, all while sitting with Complainant remotely.  McClendon then acted as Complainant's advisor and support person, providing encouragement and cross-examining Roe's witnesses.

160.    McClendon's conduct, much like that of the associate attorneys of the general counsel's office, was unapologetically adversarial to Plaintiff.  She, along with Ray and Hospodor, influenced the panel members to believe Doe was *the* adverse party, and a danger, to UMMC.[5]

---

[5] It is also notable that UMMC had campus police officers present outside both the professionalism appeal panel and the Title IX panel.  This was done to influence the panel

161.   McClendon exhibited a lack of proper Title IX training, general ineptitude and callous, hateful bias, in leading the SMIT team.  She could not hide her bias towards Plaintiff, as the Black male.  The Complainant, as the female was treated far more favorably than Plaintiff, as the male respondent.

162.   Greenwood, who met with the Complainant twice, in addition to McClendon, who met with her at least once, was present to oversee the injustice at the hearing. The Title IX administrators ensured Complainant took advantage of the accommodations provided by UMMC, including the assistance of the two advisors at the Title IX hearing. Greenwood also inappropriately coached the Title IX panel members in the trauma informed approach throughout the hearing, providing a built-in advantage for "victims."[6]

163.   McClendon filled the dual roles of investigator and prosecutor/advocate, despite prohibition of such in the newly established Title IX regulations.   In addition to serving as investigator and the prosecutor, McClendon acted on complainant's behalf after the initial presentation of her report's findings.

164.   In juxtaposition to her consistent, omnipresent support of complainant, McClendon did the bare minimum to feign fairness, concern or even slight interest in justice for Plaintiff.

---

members to make them think Plaintiff, the victim of assault on April 11, 2019, was dangerous and a threat to the UMMC community.

[6] The use of the trauma-informed approach has come under fire from scientists and courts alike. See "Memory and Neuroscience Experts Warn Title IX Training Is Driven By Junk Science, at https://www.thecollegefix.com/bulletin-board/memory-neuroscience-experts-warn-title-ix-trainin g-driven-junk-science/ ("One of the 'self-styled experts in the neurobiology of trauma' is Michigan State University's Rebecca Campbell,19 who is not a neuroscientist and admits it's an 'overreach' to use her research as gospel in Title IX investigations"); "Judge Rebukes UC Santa Barbara for Using Trauma-Informed Approach in Title IX Proceeding" at https://www.thecollegefix.com/judge-rebukes-uc-santa-barbara-for-using-trauma-informed-appro ach-in-title-ix-proceeding/ See also Norris v. U. of Colorado, Boulder, 2019 WL 764568 at * 9 (D. Colo. 2019) (among other things, trauma-informed training supported plausible allegations of gender bias in Title IX proceedings); *see also ATIXA Position Statement,* ATIXA, available at https://cdn.atixa.org/website-media/atixa.org/wp-content/uploads/2019/08/20123741/2019-ATIX A-Trauma-Position-Statement-Final-Version.pdf.

She interviewed Plaintiff only once and offered him no accommodations from the school. Plaintiff was forced to find his own support person for the process, including the hearing.

165.    When Plaintiff did speak with McClendon, she was outwardly disrespectful to clarify that her position was adversarial to him.

166.    McClendon callously mocked Plaintiff at the hearing.  She laughed at him while he was explaining the actual events that occurred in the most traumatic time of his life, and intentionally muted the video feed at times throughout the hearing.  McClendon did not take the situation, or respondent's rights, seriously.

167.    The lack of decorum, and shameless disregard of UMMC's policy, were evident earlier in McClendon's failure to abide by the sixty-day timeline for investigation with no justification for the delay.  She had no qualms delaying the proceeding as it lasted over four months to go on her aforementioned vacation. Moreover, McClendon failed to keep Plaintiff apprised of the investigation timeline as required by UMMC policy.

168.    McClendon read her report to the panel at the Title IX hearing.  She intentionally omitted certain relevant portions of the parties' intimate communications from the investigative report and findings to support her bogus finding of sexual harassment for the April 2019 allegations.

169.    Similarly, McClendon editorialized the tenor of the April communications which she did present, removing messages where complainant was affectionate or communicated with Plaintiff after allegedly cutting off communications, to make it appear as if Plaintiff was the only one demonstrating affection or initiating conversations.  The selective inclusion and exclusion of communications, as opposed to including the entire universe of exchanges, was done specifically to portray Plaintiff as some creepy perpetrator who persisted in his pursuit of an unwilling

participant.  Neither the evidence collected by the SMIT unit, nor reality, support the conclusion finding respondent responsible for sexual harassment.

170.    McClendon was permitted to read her report under the Policy; however, she exceeded her authority by questioning witnesses for Complainant. Under the policy, Plaintiff's advisor was not permitted to ask questions of witnesses at the hearing.  McClendon's bias therefore affected the entire proceeding: she chose which witnesses to interview, and which evidence to pursue; the evidence she did have was selectively included in the reporting; later at the hearing, as prosecutor and, improperly, Complainant's advocate, she read the biased report plus controlled the proceedings in presenting witness testimony and mocking Plaintiff.

171.    Ray also demonstrated abhorrent behavior throughout the hearing.  The associate general counsel, after permitting Complainant to drone on for hours on points irrelevant to the report, rudely interrupted Plaintiff's testimony in a transparent attempt to rush Plaintiff through his testimony under the guise of "panelists with family obligations."  Ray suggested, if Plaintiff's testimony was to go much longer, then they would need to adjourn the hearing and come back. Ray's obstructive behavior was, again, intended to intimidate Plaintiff and prevent him from providing all of his evidence.[7]  Plaintiff advised this was his first opportunity to present all of his evidence, given McClendon was not interested in fairness or the true, full story.  Ray backed off sheepishly.

172.    Ray's point was made, however, as Plaintiff felt pressure to hurry through his testimony, and the panelists then knew who to blame for the late evening.  Ray further revealed the reason for his interruption when he left in the middle of Plaintiff's testimony.

---

[7] Additionally, when Plaintiff began to cry during his testimony, Ray dismissively told him to leave the room.  Ray did not intervene so callously when complainant cried alligator tears.

173.    Throughout the hearing, Complainant was given wide latitude to speak on all events that allegedly occurred during the Spring 2019 semester.   Conversely, Whitfield informed Plaintiff that, because the March 2019 allegations were found to have not occurred by the investigator, that he should focus on the April 2019 allegations.   It was highly prejudicial for outside counsel to prohibit Plaintiff from responding to the incendiary March 2019 allegations that had heard by the panel during Complainant's testimony, much like it was prejudicial to prevent him from addressing the April 2019 allegation of sexual harassment during the investigatory interview with McClendon.

174.    Plaintiff was accompanied by an advisor, with unimpeachable integrity and exceptional depth of experience in the Title IX field.   Ms. Brandi Williams, an Assistant Dean of Students for Student Integrity at University of North Georgia, attended the Title IX panel with Plaintiff to serve as his advisor.   Ms. Brandi Williams has over 20 years of experience working with student discipline issues and has served as both a Title IX investigator and a Title IX hearing chair.   Ms. Brandi Williams was unfortunately unable to actively participate in the hearing due to UMMC's policy, but she did witness what she described as, "truly an injustice against [John Doe]."

175.    The Title IX hearing, with all of the superfluous UMMC employees present, was, according to Ms. Brandi Williams, organized to provide "an intimidating environment for [John Doe]."   The environment was, much like McClendon's investigation, set up for Complainant to have all of the support and services provided, whilst there was nothing in the way of support for Plaintiff.   Ms. Brandi Williams observed this dynamic at the hearing, "show[ed] a bias on behalf of the hearing panel and the university," and she further noted UMMC's show of force was intended to intimidate Plaintiff.

176.    UMMC's intimidation tactics, coddling Complainant then rushing Plaintiff, as well as the Defendants' genuine disinterest in justice, created an environment where Plaintiff's appeal would never be given fair consideration. Accordingly, the appeal panel rubberstamped McClendon's finding of responsibility.

177.    The Title IX process, like the professionalism panel, was yet another vehicle for Plaintiff, the "one" Black male who was railroaded by UMMC, kicked out under the pretext of "professionalism" concerns and the manufactured Title IX kangaroo-court-approved Sexual Harassment.

### F.    Aftermath:   Plaintiff Joins Long Line of Black Males Undone by Unjust System in Mississippi

178.    Sadly, the indignity and injustice did not stop for Plaintiff after the August 15, 2019, Title IX appeal hearing. Plaintiff was officially expelled from UMMC a second time, and his dreams of becoming a doctor, and beacon of light to lead and treat the underserved communities in Jackson have been extinguished.

179.    Complainant, Clark's barricade of Sam and Karam, along with their friends and compatriots, like McDonnell participated in a never-ending smear campaign, defaming Plaintiff to his former classmates, colleagues and neighbors, so that his hard work, reputation and good name have all been dragged through the proverbial mud without recourse.

180.    The campus police, after refusing to permit Plaintiff to file a report of assault against Sam and Karam, finally permitted Plaintiff to report the assault by both members of Clark's barricade in October 2019.  Upon information and belief, their co-conspirators at UMMC informed the campus police that the report could be taken for Plaintiff's railroading was complete. The expulsion would not come back to haunt them.

34

181.    Plaintiff attempted to pursue justice through the Hinds County Justice Court but, sadly, the criminal justice system remains unjust for Black people in this country.

182.    On December 6, 2019, the unplanned start of trial, Ray and UMMC intervened to speak to the local prosecutor. Ray was present at the trial to support Sam and Karam. Upon information and belief, Ray notified the prosecutor that UMMC did not want to see a conviction.

183.    The prosecutor did not admit the Title IX transcripts, which revealed Sam and Karam changed their stories.  The take down of Plaintiff was complete.

184.    Unfortunately for Plaintiff, and all African-American males enrolled in UM's medical college, the unconstitutional injustice described herein has happened before and will surely happen again; for the institutional biases and systemic racism are so imbedded in UM's culture that the indignity Plaintiff suffered was not only possible but highly probable.

## II.        BACKGROUND

### A.  Plaintiff's Treatment Came Directly Out of a Long and Well-Established Institutional Policy Which Routinely Denies Due Process and Treats Black Men Worse Than Others

#### i.   UM's History of Institutional Racism

185.    The University's longstanding history of racial discrimination has been covered extensively by local media.  The history appears deeply rooted within the public university's fabric, including the nickname.  "Ole Miss" was proposed in 1896 by a student, and came "from the language of the Ante-bellum 'Darkey,' who knew the wife of his owner by no other title than 'Ole Miss." *See* Becca Andrews, *The Racism of "Ole Miss" Is Hiding in Plain Sight*, Mother Jones Daily (Jul. 1, 2020).

186.    The University's Chancellor has failed to respond to negative press about the school's roots with contrition, whether with a simple apology and acknowledgment of the past,

or even by denouncing the name as a nod to the days of slavery and the persistence of racial caste in the school's community.

187.    Uncomfortable discussions about racism, and ineffective responses to this long-standing hatred, have been a constant for decades at institutions of higher learning in Mississippi. At a minimum, the discourse can be traced back to the heroic efforts of James Meredith in becoming UM's first Black student in 1962.

188.    By way of recent example, in 2014, UM students complained of deep-seated racism within Greek life, which makes up a large part of the student body.  One report noted that "every black student in the room said that they had been called the 'N-Word' at least once on campus" and went on to state, "[f]rom rejection of people of color into the organizations, to chanting 'The South will rise again' at sporting events, to hurling racist and sexual epithets at innocent passers-by, the Greeks are viewed as a major problem." *See* Scott Jaschik, *Mississippi tackles race relations and 'Ole Miss' nickname*, Times Higher Education (2014).

189.    That same year, in April 2014, a group of fraternity members tied a noose around the neck of a James Meredith statue.  *See* Associated Press, *Ole Miss frat shuttered in wake of noose accident*, CBS News (Apr. 18, 2014).

190.    A few months later, in July 2014, a Black student, and member of the Honors College, was attacked by a group of men when she returned to her housing complex.  The men "doused her with an alcoholic drink and called her a 'black nigger.'" *See* Emily Wagster Pettus, *Ole Miss moves Confederate statue from prominent campus spot*, ABC News (Jul. 14, 2020).

191.    Ed Meek, whom the School of Journalism was formerly named after, started a Facebook controversy when he posted photos of two Black women after a football game, suggesting the police needed to take care of the 'community problem.'  *See* Ko Bragg, *Meek's*

*Post on Black Women Prompts Demand for Renamed Journalism School*, Jackson Free Press (Sept. 21, 2018).

192.     The University has historically failed to adequately address incidents of racism, as evidenced by its mishandling of the two students that posed with guns in front of a shot-up Emmett Till memorial sign.  *See* Jerry Mitchell, *Here's Proof Ole Miss Knew Identities of Two Students Who Posed in Front of Shot-Up Emmett Till Sign, but Did Little*, ProRepublica (Jul. 30, 2019).  Chancellor Larry Sparks did not publicly reprimand the students.  He acknowledged UM mishandled the situation, but only in response to national media coverage.

193.     When confronted with a number of racist emails about Black students, produced by a UM graduate, the Provost called the emails "appalling," yet declined to address the situation fully.  He failed to share how the University would address these rotten systemic issues throughout the University and gave no assurances it would do so.  *See* Christian Middleton and Donna Ladd, *'Ole Miss' Vs. 'New Miss': Black Students, Faculty on How to Reject Racism, Step Forward Together*, Mississippi Free Press (Aug. 15, 2020).

194.     In December of 2020, UM sent a termination letter to Dr. Garrett Felber, a celebrated, tenure track assistant professor of Black history, who had a well-documented history of raising grant money for studies and programs dedicated to educating and empowering individuals currently stuck in the American carceral system.  *See* Christian Middleton, *UM Fires History Professor Who Criticizes 'Powerful, Racist Donors' and 'Carceral State'*, Mississippi Free Press (Dec. 15, 2020).  Dr. Felber had previously been awarded a one-year fellowship at the W.E.B. Du Bois Research Institute at Harvard in August of 2020.  *Id*.  Dr. Noell Wilson, UM's History department chair, praised Dr. Felber publicly to UM News in August 2020, lauding, "his

national profile in the field of Black history," and the advancement of his "two pioneering interpretive projects." *Id*.

195.    Despite the public praise from his department chair four months prior, Dr. Felber received his termination letter on December 10, 2020, advising his employment with UM will end December 31, 2021, due to his alleged "repeated refusal to speak" with Dr. Wilson. *Id*.

196.    Dr. Felber refutes his chair's claims and suspects UM's reasons for ending their relationship with him are more nefarious. He submits the firing is a direct response to a conflict which arose in late October 2020, when Wilson rejected a $42,000 grant the History department was awarded for an education project on mass incarceration and immigrant detention. Wilson provided Dr. Felber with a pretextual response to the racist rejection, and claimed the project was political, rather than historical, and could potentially harm the history department's ability to procure funding. *Id*. Dr. Felber tweeted his assessment of the dynamic, "The real issue is that (UM) prioritizes racist donors over all else. So it's not some mythic politics v. history binary, but that *this antiracist program threatens racist donor money. And racism is the brand. It's in the name*." *Id*. (emphasis added).

> ### ii.    UMMC'S Institutionalized Racism: 'One Black Student from Every Class'

197.    Of course, as the instant matter exemplifies, the University's issues with race are not contained to the Oxford flagship campus. Indeed, while UMMC's Public Relations Department works overtime to generate favorable press boasting of a diverse, evolved community at the State's only academic medical center and only Level 1 trauma center, UM's unjust treatment of Black students is also prevalent at the UMMC satellite campus, among both the medical students and the administrators.

198.    In 2019, the Mississippi medical scene was described as having "a sinister history of intransigent racial discrimination the state is still trying to overcome." *See* Gary Pettus, *Medicine still mending from Jim Crow era*, Mississippi Medicine (2019). Clearly, this 'sinister history' still haunts UMMC to this day.   Plaintiff was the subject to this 'intransigent racial discrimination' and was dismissed as a result.

199.    UMMC's  unconstitutional discrimination is not merely conceptualized in the media but is felt firsthand by the Black students within the University's medical program, such as Plaintiff. Upon information and belief, UMMC has a history of giving stronger due process protections to white students than the nominal protections for similarly situated Black students in disciplinary proceedings.

200.    Sadly, the Black students at UMMC, like Plaintiff and his classmates, will inevitably hear a sad, prophetic refrain upon entering their chosen medical school: 'UMMC kicks out one Black student from every first-year class.'   Whether the pretextual reason provided is an alleged professional or academic basis, Plaintiff was the 'one' from his class.

201.    Plaintiff's class, the class of 2022, was apparently the largest class in history of UMMC, with 165 students; however, much like UM, Black students are sadly underrepresented in the medical school as compared to the state's demographics.   Despite the increased admission, Plaintiff was only one of ten African American students in the class of 2022, seven male and three females.   He certainly did not receive the same due process protections as his white counterparts.

202.    For example, on information and belief, a former white medical student and alumnus of UMMC was permitted to have legal counsel present evidence and advocate on the student's behalf during school disciplinary proceedings for alleged HIPAA violations.  This student was

suspended for two weeks and was permitted to have his legal counsel defend him at a school hearing to remove the sanction from the student's record. This student has successfully finished his education at UMMC and now works as a medical doctor.

203.    In contrast, Plaintiff was not permitted to have his legal counsel assist him during his school disciplinary proceedings. Rather, Plaintiff was told multiple times that his legal counsel was only permitted to be present at the hearing and was not permitted to actively represent Plaintiff even though the sanctions Plaintiff was facing were far more severe than that of the aforementioned white student with adequate legal counsel.

204.    UMMC's tendency to afford white students more due process than Black students is not limited to this isolated incident. On information and belief, a white medical resident, when facing multiple accusations of sexual misconduct, was not officially removed from the residency program until after the conclusion of the Title IX investigation.

205.    In Plaintiff's case, however, UMMC inflicted the unduly harsh sanction of dismissal upon Plaintiff *before the Title IX investigation was commenced*, under the guise of unspecified "professionalism" charges.

206.    On information and belief, there are multiple additional white students that underwent the Title IX investigative process at UMMC and to whom UMMC did not apply the same presumption of guilt and unduly punitive sanction as it has done to Plaintiff, whether before or after the conclusion of the Title IX investigation.

207.    Additionally, a white undergraduate student of UM was found responsible of rape, a more serious finding than the one Plaintiff was unjustly found responsible and dismissed for, yet said white student successfully appealed his expulsion, which was reduced to a two-year suspension.

208. This deep-rooted bias against Black male students is also felt in the educational setting.

209. Plaintiff observed a white student cheating on a Histology exam, after which Plaintiff and a fellow Black student reported the cheating to the professor, as the UMMC code requires.  The white professor did not want to hold the white student responsible, so he excused the cheating.

210. Further, the first Black medical class president was voted out of her position during her second year for a white classmate; upon information and belief, a class president being voted out is as rare as a Black student being voted in.

211. On information and belief, a certain school administrator at UMMC exemplifies the institutionalized racism by refusing to work with Black medical students on their recruiting efforts.  The medical students attempted to recruit other Black students by inviting the undergraduates from colleges across Mississippi to UMMC.  The plan was for the college students to attend panels and workshops aimed at improving their applications and maximize performance at interviews.  The administrator did not want to help with this noble cause.

212. UMMC has a history of the underhanded, racist behavior on display in the instant matter.  In fact, the Honorable Carlton W. Reeves has noted, "[U]nfortunately, this is not the first time a plaintiff has produced evidence that a UMC manager asked a subordinate to fabricate 'disparaging letters concerning [the plaintiff's] professionalism.' *Zhan v. Univ. of Mississippi Med. Ctr.*, No. 3:14-cv-777-CWR-FKB, 2016 WL 5374141, at *5 (S.D. Miss. Sept. 26, 2016)." *Smith v. Univ. of Mississippi Med. Ctr.*, No. 3:16-CV-885-CWR-FKB, 2018 WL 3231267, at *2 (S.D. Miss. Mar. 7, 2018).

213.    UMMC has certainly participated in a multitude of public relations campaigns to portray themselves as proponents of social justice and justice in health, but the oft-described "justice" is hard to come by for Black students.

214.    The University's glacial, if not nominal, movement towards protecting the Black students from the unjust treatment and racial discrimination still plaguing the school's halls is in stark contrast to the expeditious advancement of female students at UMMC in accordance with the Vice Chancellor and Dean of the School of Medicine, Dr. Lou Ann Woodward's, stated plan.

215.    The advancement of female medical students, like the eradication of sexual assault on college campuses, is a noble goal no right-minded person could argue with; however, the hypervigilance for responding to complaints of sexual misconduct has led to a system in which male students, particularly Black male students like Plaintiff, are provided limited rights and limited ability to defend themselves against false accusations.

### B.  UM Faces Federal Pressure to Respond Aggressively to Complaints of Sexual Misconduct

#### i.   The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints

216.    On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" ("DCL").

217.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

218.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

219.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

220.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of the lowest possible burden of proof— "more likely than not" — in cases involving sexual

misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

221.    The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it stated (DCL at 12) that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation.  Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16).

222.    The DCL (p. 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

223.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

224.    Before the DCL, colleges and universities generally did not use their own disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

225.    After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

226.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled Questions and Answers on Title IX and Sexual Violence

("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf  (OCR's April 2014 Q&A at 9, 12.)

227.   The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that investigations and hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id*. at p. 31.

228.   In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, the document states that schools:

> a.   "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);
>
> b.   may decide to eliminate all opportunities for "cross-examination" (p. 31); and
>
> c.   must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

229.   Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

230.   In the same month that the OCR issued its April 2014 Q&A on Title IX, the White House issued a report titled Not Alone, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See White House Task Force to Protect Students from Sexual Assault*, Not Alone (Apr. 2014), available at

https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further
advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title
IX, and could therefore initiate investigation, compliance review, and/or litigation against
schools suspected of violating Title IX.

231.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified
before the United States Senate, warning that if the OCR could not secure voluntary compliance
with the DCL from a college or university, it could elect to initiate an administrative action to
terminate federal funds or refer the case to the Department of Justice.   *See* Testimony of
Catherine E. Lhamon, *Assistant Secretary Office for Civil Rights,* U.S. Department of Education
(June                                    26,                                    2014),
https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.
pdf.

232.    The threat of revocation of federal funds—the ultimate penalty—was a powerful tool
in motivating colleges to aggressively pursue and punish male students accused of sexual
misconduct.   In that regard, Anne Neal, of the American Council of Trustees and Alumni,
observed: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I
think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*,
National            Public            Radio            (Aug.            12,            2014),
https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-ne
w-attention. Neal explained that "schools are running so scared of violating the civil rights of
alleged victims that they end up violating the due process rights of defendants instead."

233.    Likewise, on September 1, 2014, the Chronicle of Higher Education noted that
colleges were facing "increasing pressure from survivors and the federal government," including

claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id*.

234.    Notably, a study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates and has no negative impact on securing donations.  *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

235.    The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *Id*.  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." Ibid.  In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases at the expense of the rights of the accused student, and nothing to lose.

236.     Colleges and universities, including UM, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like UM, have limited procedural protections afforded to respondents, like the Plaintiff, in sexual misconduct cases.

237.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Sept. 29, 2020).

238.     UM has found itself on the receiving end of such investigations after a complaint was lodged against it with the OCR in 2010 for allegedly mishandling allegations of sexual assault. On information and belief, the complainant in the OCR investigation was female and the respondent was male. On information and belief, UM entered into a resolution agreement as a result of the investigation, vowing to revise its policies to bring them into compliance with Title IX as well as compensate the complainant for education-related expenses.

239.     The government utilized financial pressure to compel colleges to follow the DCL and related, subsequent mandates, threatening loss of federal funds for any institution that failed to adhere to the new Title IX policies.  If the "stick" of threatened loss of funding was not enough, the federal government also enticed universities to overhaul their sexual misconduct policies and procedures with a "carrot," additional federal funding, specifically the Department of Justice, Office on Violence Against Women ("OVW") Grants to Reduce Sexual Assault, Domestic Violence, Dating Violence, and Stalking on Campus Program ("OVW Campus Grant").

240.    The solicitation announcement for the OVW Campus Grant in 2011 explained that Congress created the grant in response to the "unique issues and challenges" faced by college and universities in addressing sexual assault, domestic violence, dating violence and stalking. According to the 2011 OVW Campus Grant solicitation, Congress affirmed these crimes were "serious problems on college and university campuses." *See 2011 OVW Campus Grant Solicitation*, Announcement OVW-2011-2901, pg. 3.

241.    Congress noted, "Unlike victims of violence against women in the larger community, students victimized by other students often face additional challenges," namely the victim's sharing a residence or attending a class with the perpetrator, the victim's difficulty remaining anonymous in the insular environment as well as fear and anguish suffered by the victim as a result of continued harassment or shaming at the hands of the perpetrator, classmates or the perpetrator's friends. *Id*.  Congress apparently reviewed some of the aforementioned "studies" relied on by the White House to similarly conclude that "sexual assault, as well as other forms of violence against women, are seriously underreported, both generally and on campuses, indicating that the problem is even more acute than the available data suggest." *Id*. at 3-4.

242.    The OVW Campus Grant sought to entice, and finance, universities' efforts to encourage reporting by victims of violence.  Victims on campus apparently cited a number of reasons for not reporting the violence, including uncertainty that the violent behavior was criminal, embarrassment, fear of reprisal and "relenting to peer pressure, especially when the perpetrator is a prominent member of the campus community, such as an athlete." *Id*. at 4.

243.    The OVW evinces a clear preference for schools to assist victims in initiating criminal proceedings through local law enforcement over the previously favored, closed administrative procedures or mediation. *Id*.

244.     OVW Campus Grant recipients were encouraged to adopt and publicize policies that encourage students to report the stated crimes, even when alcohol, drugs and other illegal activities may be involved.  *Id*. at 10.   The recipients were required to create a coordinated community response, both within the school's departments, and with local law enforcement and local community victim services.  *Id*.   The local community partners could receive money from the university's grant too.  *Id*. at 11.   It was in everyone's financial interest to inflate the amount of Title IX sexual misconduct matters.

245.     The OVW Campus Grant's purposes placed a premium on encouraging students to report stated crimes, the school's aggressive investigation, adjudication and punishment of stated crimes as well as the rigid, statutorily required reporting of statistics of the same.   In short, recipients of the OVW Campus Grant accepted money with the understanding that the amount of Title IX matters handled at each school would increase.

246.     UM received $253,250 from the OVW Campus Grant in 2012.

247.     According to the OVW, the purpose of the Campus Grant is to "reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims and holding offenders accountable."   *See* Dep't of Justice, *About OVW Grants Programs*, https://www.justice.gov/ovw/grant-programs.

248.     The official description of the OVW Campus Program grant, which was authorized by the Violence Against Women Act, 42 U.S.C. § 14045(b) described the grant as "strengthen[ing] the response of institutions of higher education to the crimes of sexual assault, domestic violence, dating violence and stalking on campuses and enhance[ing] collaboration among campuses, local law enforcement, and victim advocacy organizations."  Dep't of Justice, *About OVW Grants Programs*, https://www.justice.gov/ovw/grant-programs.

249.    Specifically, the funding is intended to "support[] activities that develop and strengthen victim services and strategies to prevent, investigate, respond to and prosecute these crimes," by "develop[ing] and strengthen[ing] trauma-informed victim services and strategies," and requiring applicants to "establish an external partnership with at least one criminal justice system or civil legal assistance entity or organization such as external law enforcement agencies [or] prosecutor's offices."   Dep't of Justice, *Select Federal Agency Resources*, https://www.justice.gov/atj/select-federal-agency-resources;           *see           also* https://www.justicegrants.info/GrantDetails.aspx?gid=39304.

250.    The program encourages grant recipients to "create or revitalize large-scale efforts that treat sexual assault, domestic violence, dating violence, and stalking as serious offenses by adopting effective policies and protocols, developing victim services and programs that prioritize victim safety, ensuring offender accountability, and implementing effective prevention approaches."  In that regard, "[c]olleges and universities should demonstrate to every student that these crimes will not be tolerated, that perpetrators will face serious consequences, and that holistic services are available for victims."

251.    On information and belief, UM was awarded the Campus Grants based upon its proof of compliance with the grant application requirements and program goals, as identified above.

252.    It is no surprise, therefore, that UM's investigative procedures focus on victim advocacy, rather than impartial adjudication, including the single-investigator model and the absence of any live hearing or opportunity to test the accuser's credibility by cross-examination.

253.    The problems inherent to the single investigator model—bias, inaccuracy, and partiality—are further exacerbated by UM's "trauma-informed" staff training program, which,

upon information and belief, focused heavily on supporting accusers, bolstering their credibility, and ensuring that reports of sexual misconduct result in culpability and severe punishment for the male accused.

> ## ii. The 2017 Revocation of the DCL and UM's Refusal to Update its Policies Accordingly

254.    On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many." Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), available                                                                                  at https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

255.    DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

256.    Acknowledging the massive pressure placed on universities and educational programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from—Washington." *Id*.

257.    With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." Id.  She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id*.

258.    On September 22, 2017, the OCR formally rescinded the DCL and the April 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

259.    In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*."   Dep't of Ed., *Dear Colleague Letter* (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.   (citations omitted) (emphasis added).

260.    In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

261.    The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches."  2017 Q&A at 4, 5.

262.    The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct."  *Id*. at 3. In that regard, the "elements in evaluating whether a school's

grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an *adequate, reliable, and impartial* investigation of complaints." *Ibid*. (emphasis added).

263.    The 2017 Q&A also requires investigators to "synthesize *all available evidence—* including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id*. at 4 (emphasis added).

264.    The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id*. at 4.

265.    Likewise, the 2017 Q&A, in a significant departure from the DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. *Id*. at 4; *see also id*. footnote 19 at 4.

266.    The 2017 Q&A suggests that the policies and procedures in place at UM at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

267.    Despite sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, UM administrators stated that the University would not change its policies and procedures, disagreeing with Devos' claim that accused students had been treated unfairly. *See* Taylor Vance, *Students, Title IX office respond to recent policy changes*, The Daily Mississippian (Sept. 28, 2017). This statement was made in spite of the fact that the University's training materials explicitly stated that "when Complainants withhold exculpatory

54

details or lie to an investigator or the hearing panel, the lies should be considered a side effect of an assault." *Doe v. Univ. of Mississippi*, No. 3:16-CV-63-DPJ-FKB, 2018 WL 3570229, at *11 (S.D. Miss. July 24, 2018).

268.    On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-s chools-support-survivors-and-due-process-rights-all.

269.    Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs, including UM, have mostly continued with guilt-presuming practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

270.    In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, "Expanding the Frame: Institutional Responses to Students Accused of Sexual Misconduct." (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-o f-sexual-misconduct) The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

271.    In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget

dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are shunned by administrators to defend themselves "due to perceived pushback from members of the campus community who disagree with providing respondent services."

> iii. **UM Faces Years of Criticism for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty**

272.   The OCR investigation and OVW Grant were not the only pressure on UM to strengthen its response to complaints by female students of sexual misconduct.

273.   For several years leading up to the investigation and adjudication of allegations involving Plaintiff, UM students openly accused the University of not taking allegations of sexual misconduct seriously and failing to adequately punish perpetrators of sexual assault, particularly UM's failure to protect female students on campus.

274.   The issue of sexual assault and harassment on UM's campus drew national headlines in 2016, when a sorority member wrote a viral Facebook post about an annual fraternity Derby Day, which she claimed objectified women and stated "[t]his even epitomizes the problems we have on this campus regarding the roles of women." *See* University of Mississippi, *Title IX*, available at https://projects.chronicle.com/titleix/campus/University-of-Mississippi/.

275.   In response, students throughout the school commented on UM's culture, stating that "[s]exual harassment is part of the culture" and that Derby Day was "not just an isolated case"

but rather "show[s] how everything is interconnected" at UM. Faculty also offered their comments about the day, indicating that it would take "more than one incident of bad publicity to change a Greek culture almost as old as the university itself." University administrators reportedly used the dialogue incited by the sexual harassment "to make the fraternities a safer place for women." *See* Larrison Campbell, *Students confront sexual harassment beyond Derby Days*, Mississippi Today (Apr. 21, 2016).

276.    The University investigated the incident, stating that the reported behavior "clearly violates campus policy and one of the UM community's core values, which is for our students to show respect and dignity for all." Before the conclusion of the Title IX investigation against the fraternity, the Dean of Students gave fraternities a list of proposed policies to "curb risky behaviors" such as sexual assault. The University ultimately responded to the allegations of sexual harassment at the event by placing the fraternity that hosted the event on a full-year probation and prohibited it from having an incoming rush class. UM also required all of the members of the fraternity to take part in workshops on sexual assault and harassment. *See* Royce Swayze and Bracey Harris, *Ole Miss concludes sexual harassment frat investigation*, Clarion Ledger (May 6, 2016).

277.    Also drawing attention to the campus issue of sexual assault, particularly against females, Rebels Against Sexual assault was formed to "raise awareness for sexual assault and dating violence, educate others about consent, and support survivors of sexual assault." Notably, this organization's core goal is to "bring[] awareness to issues surrounding violence against women," hosting various female-oriented events such as the "vagina monologues," plays about women's experiences with sexuality and assault to empower women and "celebrate survivors." On information and belief, the same opportunities are not offered for males.

278.   On information and belief, the combination of federal pressure resulting from OCR investigations, along with years of criticism regarding UM's failure to protect female students and address male perpetrators, resulted in UM's employment of gender-based decision-making that infiltrated the entire Title IX process and constituted discrimination against Plaintiff because of his male gender.

279.   Separately, Dr. Lou Ann Woodward, as noted above, takes great pride in UMMC's willful increase in female enrollment as well as increasing campus accommodations and resources for women.  This admittedly noble focus was celebrated by the American Association of Medical Colleges in 2019, when it awarded UMMC the 'Emerging Leadership Award for an Organization' for their Group on Women in Medicine and Science.

280.   UM has shifted rather quickly from an institution too lenient regarding sexual misconduct towards its female students, to one in which the male students are denied basic due process rights in Title IX matters.  Dr. Woodward's focus on the noble goal of increasing female enrollment and resources at the medical school was similarly effective.

## IV.   AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT UMMC

281.   Upon Plaintiff's matriculation into the University of Mississippi, Plaintiff and UM became mutually bound by the UMMC Student Handbook (the "Handbook") and Sexual Misconduct, Sexual Assault and Sexual Harassment Policy and Procedure (Title IX) for Students and Employees (the "Policy") (collectively the "Policies").

282.   On information and belief, the Policies are updated and/or reviewed each new school year.

283.   On information and belief, the Policies are available online and available on the UMMC website.

284.   The Policies constitute and represent a contract between students and the University, and in particular, between Plaintiff and UMMC.

285.   Throughout the professionalism and Title IX processes in this case, Defendants breached their contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policies and by permitting racial and gender bias to infect and taint the proceedings.

286.   The Policies describe certain prohibited conduct which is defined in the Policy, including different types of sex discrimination and sexual misconduct.

287.   According to the Handbook, "The Medical Center adheres to the principle of equal educational and employment opportunity without regard to race, creed, sex, color, religion, marital status, sexual orientation, age, national origin, disability or veteran status."

288.   Defendants violated the Handbook when they discriminated against Plaintiff on the basis of his race and profiled him as a dangerous, aggressive Black male, resulting in his expulsion from the University without proper notice or ability to defend himself.

289.   According to the Handbook, "the Medical Center does not discriminate on the basis of sex in its educational programs or activities with respect to admissions or employment."

290.   Defendants breached this provision when they discriminated against Plaintiff on the basis of his sex throughout the investigation by providing various accommodations to the female complainant while depriving Plaintiff of his rights as stated in the Handbook, ultimately leading to his expulsion.

291.   The Handbook states that "When a student receives a report of a concern related to unprofessional behavior, the assistant or associate dean for student affairs or the assistant or associate dean for medical education shall meet with the student to discuss the incident."

292.     Defendants breached the Handbook when they expelled Plaintiff on professionalism charges after receiving a complaint from the Complainant without first speaking to Plaintiff.

293.     The Handbook states that "The executive faculty shall act as an appeal body for all academic and/or unprofessional behavior matters that concern grades, promotion and conditions imposed by suspension, dismissal or withdrawal."

294.     Defendants breached this provision when they allowed the Deans Council, the same body that decided on Plaintiff's expulsion in the matter, to act as the appeal hearing panel as well.

295.     According to the Handbook, at a professionalism appeal hearing, "The student is entitled to present witnesses or other evidence, question opposing witnesses and make opening and concluding statements on his or her own behalf."

296.     Defendants breached this provision when Plaintiff was precluded from cross-examining the Complainant or providing exculpatory evidence for the appeal hearing. Instead, Defendants omitted exculpatory evidence provided by Plaintiff and relied upon one-sided reports to justify their decision to expel Plaintiff.

297.     According to the Policy, "the University of Mississippi Medical Center (UMMC) is committed to fostering a respectful, safe, and non-threatening environment for its students and employees."

298.     Defendants violated the Policy when it discriminated against Plaintiff throughout the Title IX investigation and created a threatening environment for Plaintiff's hearing by granting the complainant numerous support services while not giving Plaintiff any support measures.

299.     According to the Policy, "UMMC is committed to prompt, effective and fair procedures to investigate and adjudicate reports of sexual misconduct and to the education of the university community about the importance of responding to all forms of sexual misconduct."

300.     Defendants breached this provision by undertaking a drawn-out, delayed, and biased investigation and adjudication of the allegations against Plaintiff which ultimately led to his erroneous dismissal.

301.     The Policy states that the scope of the Policy is "all students."

302.     Defendants breached this provision by proceeding with the Title IX investigation against Plaintiff despite the fact that he had already been dismissed via the professionalism hearing and therefore was no longer a "student."

303.     The Policy states that "Special emphasis is placed on the rights, needs, and privacy of the student or employee with the complaint, as well as the rights of the accused."

304.     Defendants breached the Policy by demonstrating no regard for the rights of the accused, by denying Plaintiff of numerous basic constitutional rights as well as the rights granted within their own Policies.

305.     According to the Policy, "In cases involving students, the Title IX Coordinator, with the assistance and the approval of the Associate Vice Chancellor for Academic Affairs, shall select three (3) members of the Sexual Misconduct Investigative Team (SMIT) with no dual relationship or conflict of interest with the complainant or respondent, to investigate the complaint or report of sexual misconduct and an appropriate number of team members to serve on the hearing Panel, if a hearing is later requested."

306.     Defendants violated the Policy when they appointed McClendon to be a member of the SMIT when she had a clear conflict of interest. McClendon demonstrated favoritism toward

the Complainant throughout the investigation, catering to the Complainant's desires, and later served as one of the Complainant's advisors at the Title IX hearing.

307.   The Policy states that "During the investigation, SMIT members will collect all evidence relating to the complaint or report of sexual misconduct from all available sources and conduct interviews when appropriate."

308.   Defendants violated this provision when the investigators refused to interview any of Plaintiff's witnesses, despite their relevance to the claims. On the other hand, the investigators interviewed witnesses in support of the Complainant, despite the fact that they did not have firsthand information and merely recited what the Complainant had told them. Furthermore, the investigators altered evidence by omitting portions of the parties' conversations which showed mutual affection between the Complainant and Plaintiff.

## V.      DAMAGES

309.   As a result of Defendants' unlawful, improper, racist and gender-biased disciplinary process, Plaintiff was deprived of due process, expelled from medical school, rendered unable to pursue his chosen profession and dream of contributing to his hometown community of Jackson, Mississippi, and subjected to an erroneous outcome, including said unwarranted expulsion, precluding him from receiving the education, and six-figure scholarship, he was promised by virtue of his enrollment at UMMC.

310.   As a result of Defendants' unlawful and improper actions, Plaintiff's education and career path have been derailed, resulting in considerable economic and other harm.

311.   As a result of Defendants' racist, biased, unlawful, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start as evidenced by Clark's trespassing him from campus.

312.    As a result of Defendants' racist, biased, unlawful, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault and harassment, an unjust, defamatory classification that will prove impossible to undo in certain circles.

313.    As a result of Defendants' racist, biased, unlawful, and willful, improper conduct, Plaintiff's transcript and academic/disciplinary file are now marred by a false and baseless finding of sexual assault, sexual exploitation, and a suspension.

314.    As a result of Defendants' racist, biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer mental pain and anguish, emotional distress, reputational harm, deprivation of his education and damage to his future educational and career prospects.

### AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C. §1983: Denial of Fourteenth Amendment Procedural Due Process
### (Against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward, individually and in their official capacities)

315.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

316.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  A similar right is stated in the Fifth Amendment to the United States Constitution.

317.    In this case, the individual Defendants are state actors subject to the Fourteenth Amendment.

318.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

319.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

320.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

321.    Prior to his expulsion, Plaintiff was an exceptional student in good standing at UMMC. He maintained a constitutionally protected property interest in his continued enrollment at UMMC, to be free from arbitrary expulsion, which is recognized in the policies, courses of conduct, practices and understandings established by the University and UMMC, including the University's Student Handbook.

322.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between the University, UMMC and Plaintiff.

323.    The University of Mississippi, as a public university established by the State of Mississippi, UMMC is the health sciences campus of UM which houses the School of Medicine, and the individual Defendants, as agents of the University and individually have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

324.    Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings.  At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (1) notice, and (2) an opportunity to be heard.  *Papin v. Univ. of Miss. Med. Ctr.*, 347 F.Supp.3d 274, 279 (S.D. Miss. Sept. 28, 2018) citing *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005).  Courts have evaluated dismissals in a school setting

64

as either academic or disciplinary for purposes of evaluating the process owed.  *Papin*, 347

F.Supp.3d at 280.  The due process protections required for disciplinary proceedings are more

extensive than for academic decisions. *Id*; see also *Brown v. Univ. of Kansas*, 599 Fed. Appx. 833

(10th Cir. 2015).  An allegation of sexual harassment renders a dismissal disciplinary in nature.

*Id*.

325.    Plaintiff, therefore, received a disciplinary dismissal, for both the professionalism

charges and the subsequent Title IX proceeding.  The United States Department of Education's

Office for Civil Rights has acknowledged that public universities are required to provide

constitutional due process protections to students accused of sexual misconduct. This was

reiterated in the April 2011 Dear Colleague Letter which stated public state schools "must

provide due process to the alleged perpetrator" in sexual misconduct cases. *Id*. at p. 12.

326.    Where a student at a public university faces expulsion through a disciplinary

proceeding, a serious property interest is at stake; an expulsion will have a lasting negative

impact on the student's life, so heightened due process protections including a hearing, with the

right to present evidence, cross-examine adversarial witnesses and to call witnesses may be

required. *Doe v. Univ. of Mississippi*, 361 F. Supp. 3d 597, 611 (S.D. Miss. 2019); *Doe v. Baum*,

2018 WL 4265634, at **3-5 (6th Cir. Sept. 7, 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393,

402-04 (6th Cir. 2017).

327.    Plaintiff, as a UMMC student, faced disciplinary action that included the possibility

of suspension or expulsion if found responsible for the alleged sexual misconduct.  Plaintiff

faced the sanction of expulsion twice, first in the professionalism hearing and subsequently in the

Title IX proceeding. Accordingly, the Due Process provisions of the Fourteenth Amendment to

the United States Constitution applied to both disciplinary processes that the University utilized in his case.

328.    Plaintiff obeyed all institutional rules when he was wrongly expelled from the University, twice for the same accusations.

329.    Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing.

330.    The allegations in this case resulted in the quasi-criminal sanction of expulsion, and a permanent marking of Plaintiff's transcript, that will have lifelong ramifications for Plaintiff with respect to his education, employment, and reputation.

331.    Throughout the investigation and adjudication of the professionalism charges against Plaintiff, Defendants violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by, without limitation:

    a.    Providing Plaintiff with no notice of the charges against him;

    b.    Failing to engage in any genuine investigation into the professionalism charges, but rather taking the complainants' stories at face value

    c.    Meeting, in private, to determine Plaintiff's responsibility without providing Plaintiff an opportunity to defend himself;

    d.    Immediately dismissing Plaintiff without proper notice;

    e.    Failing to allow Plaintiff to submit exculpatory evidence and provide the names of witnesses;

    f.    Failing to provide Plaintiff with a hearing until the appeal hearing, *after* he had already been expelled by the Dean's Council;

    g.    Allowing biased decision makers to serve on the Dean's Council. By way of example and not limitation, Williams had previously and consistently openly declared her hatred for Plaintiff, and Clark served as a long-time mentor for the Complainant;

h.    Allowing the same biased decision makers to also serve as the appeals panel that determined Plaintiff's appeal, thereby rubberstamping their own decision and precluding Plaintiff a fair opportunity to have his appeal considered;

i.    Intentionally withholding exculpatory evidence from the professionalism appeal hearing and only presenting information that was detrimental to Plaintiff;

j.    Manipulating the flow of information to the appeals panel;

k.    Failing to provide Plaintiff with the evidence to be presented to the appeals panel until the night before the appeal hearing;

l.    Directing the campus police to delay taking a report from Plaintiff until after he was expelled;

m.    Failing to provide Plaintiff with the opportunity to cross-examine or submit questions to witnesses despite the possible sanction of expulsion and the issues of the complainants' credibility;

n.    Failing to apply the preponderance of the evidence standard and finding Plaintiff responsible despite a lack of evidence.

332.    Throughout the investigation and adjudication of the Title IX charges against Plaintiff, Defendants violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by, without limitation:

a.    Allowing McClendon to serve as the Title IX investigator, despite her clear bias against males;

b.    Engaging in a single-investigator model wherein McClendon both investigated and adjudicated the complaint against Plaintiff;

c.    Failing to investigate any Plaintiff's witnesses;

d.    Failing to ensure a fair, impartial, and through investigation, conducted in a timely manner;

e.    Meeting with the Complainant three times, as opposed to Plaintiff's single meeting;

f.    Failing to provide Plaintiff with the opportunity to discuss all of the charges at his meeting with McClendon;

g.     Including new allegations into the final investigation report which Plaintiff had no notice of and did not have an opportunity to respond to;

h.     Excluding exculpatory evidence from the report and manipulating evidence to support Complainant's story;

i.     Finding Plaintiff responsible for the Title IX charges without a hearing;

j.     Failing to provide Plaintiff with a hearing until the Title IX appeal hearing, *after* he had already been found responsible;

k.     Withholding evidence from Plaintiff in advance of the hearing;

l.     Allowing McClendon to serve as both the "prosecutor" and Complainant's advocate during the Title IX appeal hearing;

m.     Failing to give Plaintiff the opportunity to refute all of the allegations Complainant made at the Title IX hearing;

n.     Failing to provide Plaintiff with the opportunity to cross-examine witnesses or submit questions to witnesses, despite the possible sanction of expulsion and the issues of witness credibility;

o.     Failing to apply the preponderance of the evidence standard and finding Plaintiff responsible despite a lack of evidence;

p.     Failing to provide Plaintiff with an impartial hearing in which his appeal could be fairly considered;

q.     Subjecting Plaintiff to a Title IX investigation and adjudication despite the fact that he had already been dismissed on professionalism charges based on the *same conduct*, thereby constituting a form of double jeopardy;

r.     Upholding the finding of responsibility at the Title IX hearing despite clear evidence to the contrary and the acknowledgement that Complainant fabricated sexual assault allegations.

333.    Throughout the investigation and adjudication of the professionalism and Title IX charges against Plaintiff, Defendants, through the campus police, violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness by, without limitation:

a.     Searching and seizing Plaintiff after *he was assaulted* by Sam and Karam;

b.      Failing to preserve the video of the assault so that there would not be evidence of Sam and Karam's wrongdoing, which was done at the direction of Clark;

c.      Failing to investigate Sam and Karam despite their involvement in the assault;

d.      Failing to interview Plaintiff until after he was already dismissed, yet providing one-sided reports to bolster the charges against Plaintiff;

e.      Appearing at the professionalism hearing, Plaintiff's Title IX interview, and the Title IX hearing, to give the false and prejudicial impression that Plaintiff was a danger to the community;

f.      Failing to provide Plaintiff with a fair opportunity to make a complaint of the assault against Sam and Karam.

334.    In both disciplinary investigations, the University relied solely on statements from the Complainant and her witnesses, and determined the Complainant was credible, despite precluding exculpatory evidence from being admitted. There was no proper notice, no investigation, no neutral, thorough or fair administrators overseeing the process, no hearing prior to the determination, and thus no opportunity for cross-examination prior to his expulsion, in violation of due process of law. *Neal v. Colorado State Univ. Pueblo*, 2017 WL 633045, at *25 (D. Colo. February 16, 2017); See *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (Sept. 20, 2018) (Doc. No. 36), at p. 3; *Doe v. Baum*, 2018 WL 4265634, at **3-5; *Doe v. Univ. of Cincinnati*, 872 F.3d at 402-04; *Norris v. Univ. of Colorado*, Boulder, 362 F. Supp. 3d 1001, 1017 (D. Colo. 2019).

335.    Defendants Clark, Williams, McClendon, Greenwood, Ray, and Hospodor deprived Plaintiff of his liberty and property interests without affording him basic due process, including but not limited to, his right to a fair adjudication free of bias, his right to be innocent until shown to be responsible and not be subjected to the burden of proving innocence, his right to be heard by an impartial factfinder upon proper notice of the allegations after a fair, thorough and

impartial investigation, his right to question his accuser, challenge the credibility of the accusers as well as other adverse witnesses and the right to present evidence and witnesses in support of his defense. Plaintiff was further denied of his right to a fair appeal and his academic transcript has been permanently marked.  His dreams of being a physician to provide treatment to his community are imperiled.  He will suffer lifelong damages as a result of the University's sanction.

336.     Defendants Clark, Williams, McClendon, Greenwood, Ray, and Hospodor, as well as other agents, representatives, and employees of the University, intentionally, willfully, wantonly, oppressively and maliciously violated Plaintiff's due process rights in the professionalism adjudication and then the Title IX adjudication.

337.     Defendants Clark, Williams, McClendon, Greenwood, Ray, and Hospodor, as well as other agents, representatives and employees of the University deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the Title IX adjudication: Mississippi had been in the public eye for its lack of proper investigation into sexual assault complaints, risking an OCR investigation and the loss of federal funding or other penalties if Plaintiff was not sanctioned.

338.     As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, expulsion from UMMC denied Plaintiff the benefits of education at his chosen medical school, including significant scholarship monies, prevented him from reaching his longstanding life's goals of serving Jackson and damaged Plaintiff's reputation as well as his future and academic career prospects.

339.    Accordingly, Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward are liable to Plaintiff in their individual capacities for violation of 42 U.S.C. § 1983 and Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

340.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational opportunities, loss of career opportunities, economic injuries and other direct and consequential damages. Plaintiff's interest in the results of the disciplinary process is significant.

341.    Plaintiff further seeks punitive damages against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward for their willful, biased, unconstitutional and nefarious misdeeds.

342.    Defendant LouAnn Woodward, M.D., is being sued in her official capacity as Vice Chancellor for Health Affairs at UMMC and Dean of the UM School of Medicine.  In her role, Woodward would be the person responsible for the injunctive relief requested herein, including clearing Plaintiff's record of any finding of responsibility and unprofessional conduct, expunging any record of same, or the underlying proceedings, from Plaintiff's transcript, student conduct record and/or disciplinary file and reinstating Plaintiff as a student in good standing at UMMC.

343.    As a result of the foregoing, Plaintiff has suffered damages, including punitive damages, in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well

as the aforementioned injunctive relief directing UMMC to clear Plaintiff's record of any findings of responsibility.

**AS AND FOR A SECOND CAUSE OF ACTION**
**42 U.S.C. §1983: Denial of Fourteenth Amendment Substantive Due Process**
**(Against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward, individually and in their official capacities)**

344.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

345.   To state a substantive due process claim under section 1983, a plaintiff must: (1) allege a violation of a right secured by the Constitution; and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.  *Priester v. Lowndes County*, 354 F.3d 414, 421 (5th Cir. 2004) citing *McKinney v. Irving Ind. Sch. Dist.*, 309 F.3d 308 (5th Cir. 2002).

346.   In addition to the rights and protected interests enumerated in the First Cause of Action, a person has a protected property interest in his bodily integrity.

347.   The Fifth Circuit has consistently held that the right to be free from state-occasioned damage to a person's bodily integrity is protected by the Fourteenth Amendment's guarantee of due process."  *Priester* at 421 citing *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 450-451 (5th Cir 1994); *Petta v. Rivera*, 143 F.3d 895 (5th Cir. 1998).

348.   In the instant matter, Plaintiff suffered damage to his bodily integrity, as he was physically injured by Clark's deputized barricade, Sam and Karam, when he was assaulted on April 11, 2019. Subsequently, Plaintiff suffered from debilitating depression, anxiety, overwhelm, mental anguish and emotional disturbance as further result of the attack, the cover-up and the sham proceedings discussed herein. The injuries amounted to significant

damage to Plaintiff's bodily integrity, and said deprivation of Plaintiff's own property was committed by people acting under the color of state law.

349.    Clark was a state actor during the relevant time period, as he was employed by UMMC as an Associate Dean for Student Affairs.

350.    Clark met with Sam and Karam on April 8, 2011 and advised the white male first year medical students to protect the white female complainant from Plaintiff, the Black male whom Clark deemed dangerous.

351.    Rather than speak to Plaintiff about the allegations, informally advise Plaintiff and Complainant to stay away from each other or initiate the appropriate procedures under Title IX, such as obtaining a no contact order, Clark directed his new deputies to form a physical barricade between Complainant and Plaintiff.

352.    By not advising Plaintiff of Complainant's defamatory allegations, or his directions to Sam and Karam authorizing protection by physical force, on April 8, 2019 and each day thereafter, Clark knowingly placed Plaintiff in danger.  He did so with deliberate indifference.

353.    Clark knowingly placed Plaintiff's bodily integrity at risk and, unfortunately, on April 11, 2019, the foreseeable outcome of Clark's barricade attacking Plaintiff came to fruition. As such, Clark must be accountable for Plaintiff's foreseeable injuries that resulted from the assault.

354.    Further, Sam and Karam's conduct in assaulting and injuring Plaintiff was "fairly attributable to the State," because the injury was caused by the exercise of some right or privilege created by the state, a rule of conduct imposed by the state, or by a person for whom the state is responsible.  *See Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988).

355.    Sam and Karam, for purposes of their April 11th assault, may fairly be said to be state actors because Clark provided significant encouragement to his barricade, whether in deputizing them, creating a right or privilege permitting them to use physical force to protect Complainant, or in covering up for them in the aftermath of the April 11, 2019 assault.

356.    Additionally, UMMC campus police engaged in an unlawful search and seizure when they searched Plaintiff following the assault, despite the fact that Plaintiff was the one that had been assaulted.

357.    Indeed, Clark conspired with Williams, the campus police, Ray and Hospodor to cover up the assault by trespassing Plaintiff, preventing him from filing a timely campus police report, failing to investigate the assault and instead dismissing Plaintiff on bogus professionalism charges, as well as manipulating the evidence, i.e., ignoring exculpatory witnesses and willfully allowing the tape to be deleted to hide the fact Plaintiff was the victim, not the assailant.

358.    Further, UMMC, through Ray, communicated with the Hinds County prosecutor, who was assigned Plaintiff's assault complaint against Clark's barricade, prior to the hearing and, upon information and belief, advised the school he did not want to see Sam and Karam prosecuted.   Clark's barricade walked away without repercussions from the criminal matter shortly thereafter.

359.    Additionally, a person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

360.    Prior to his expulsion, Plaintiff was a student in good standing at UMMC. His constitutionally protected property interest and enrollment at UMMC and to be free from

arbitrary expulsion arises from the policies, courses of conduct, practices and understandings established by UMMC, including the Student Handbook and Title IX Policy.

361.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between UMMC and Plaintiff.

362.    UM, as a public university established by the state of Mississippi, and UMMC, as an extension of UM, and the individual Defendants have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by UMMC.

363.    Defendants Clark, Williams, McClendon, Greenwood, Ray and Hospodor violated Plaintiff's right to due process when they engaged with the UMMC police department to build a case against Plaintiff while depriving him of any opportunity to defend himself, despite the utter lack of evidence that sexual harassment had taken place.

364.    Defendants Clark and Williams orchestrated Plaintiff's banishment from campus following Sam and Karam's assault of Plaintiff by issuing Plaintiff a notice of his expulsion without any prior notice, investigation, or opportunity for Plaintiff to present exculpatory evidence.

365.    Defendants Clark and Williams then rubberstamped their own decision to uphold Plaintiff's expulsion on appeal.

366.    Defendants McClendon and Greenwood, with the assistance of Ray and Hospodor, then implemented a biased Title IX investigation after he had already been expelled which deprived Plaintiff the ability to present a defense or submit evidence. Defendants then found Plaintiff responsible for sexual harassment without a hearing, deeming Complainant as credible despite her shifting stories.

367.     McClendon demonstrated clear gender bias in her "prosecution" of Plaintiff at the Title IX appeal hearing and subsequent advocating for Complainant.

368.     Defendants precluded Plaintiff's ability to have a fair appeal hearing, denying him of his right under the Policy to appeal the decision and precluding him from the ability to present a defense.

369.     As a result of the aforementioned due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, expulsion from UMMC denied Plaintiff the benefits of education at his chosen medical school, including significant scholarship monies, prevented him from reaching his longstanding life's goals of serving Jackson and damaged Plaintiff's reputation as well as his future and academic career prospects.

370.     Accordingly, Defendants Clark, Williams, Ray, and Hospodor are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

371.     As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, harm to his bodily integrity, physical injury, pain, suffering and mental anguish, emotional distress, depression, anxiety, fear for his safety, confined to bed, paranoia, as well as the resultant loss of educational opportunities, loss of career opportunities, economic injuries and other direct and consequential damages resulting from his expulsion. Plaintiff's interest in his bodily integrity as well as the results of the disciplinary processes and criminal matters, are all significant.

372.    Plaintiff further seeks monetary relief, including punitive damages, against Defendants Clark, Williams, Ray, and Hospodor for their willful, biased, unconstitutional, and nefarious misdeeds.

373.    As a result of the foregoing, Plaintiff has suffered damages, including punitive damages, in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the aforementioned injunctive relief directing UMMC, and Woodward, to clear Plaintiff's record of any findings of responsibility.

**AS AND FOR A THIRD CAUSE OF ACTION**
**42 U.S.C. §1981 Denial of Equal Protection: Discrimination Based on Race**
**(Against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and**
**Woodward, individually and in their official capacities)**

374.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

375.    The Civil Rights Act of 1964, 42 U.S.C. Section 1981 prohibits discrimination based on race, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

376.    The phrase "to make and enforce contracts" refers to the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and condition of the contractual relationship. 42 U.S.C.A. § 1981 (West).

377.    The University of Mississippi's EEO statement guarantees that "The University of Mississippi provides equal opportunity in any employment practice, education program, or education activity to all qualified persons. The University complies with all applicable laws regarding equal opportunity and affirmative action and does not unlawfully discriminate against any employee or applicant for employment based upon race, color, gender, sex, pregnancy, sexual orientation, gender identity or expression, religion, citizenship, national origin, age, disability, veteran status, or genetic information."

378.    Moreover, the University's Non-Discrimination and Complaint Procedure reiterates that "The University of Mississippi does not unlawfully discriminate on the basis of race, color, gender, sex, pregnancy, sexual orientation, gender identity or expression, religion, national origin, citizenship, age, disability, veteran status, or genetic information."

379.    Plaintiff entered into a contract with the University when he enrolled as a student and paid the required tuition and fees. The educational contract formed between Plaintiff and the University includes all policies and procedures, such as those noted above.

380.    Notwithstanding, as set forth in detail hereinabove, Defendants subjected Plaintiff to disparate treatment on numerous occasions which resulted in Plaintiff's unlawful dismissal because of his race and racial animus of defendants, including but not limited to:

  a. Clark directing two white men to form a barricade to watch, follow, and guard against Plaintiff under the pretense of protecting a white female without having heard all the evidence;

  b. The University's failure to discipline the white men that assaulted Plaintiff, yet directing the police investigate Plaintiff following the assault;

  c. Defendants' directions to the campus police to not prosecute the white males for their assault of Plaintiff;

  d. Clark's immediate dismissal of Plaintiff because of his perceived notion of Plaintiff's "danger" as an aggressive Black male, without affording Plaintiff the proper procedure mandated in the Handbook;

e.  Defendants' instructing campus police to willfully permit deletion of the surveillance videotape recording of the assault of Plaintiff by Clark's barricade in order to cover-up the crime, and maintain the unconstitutional dismissal of Plaintiff;

f.  Ray's threatening Plaintiff with criminal charges, despite not prosecuting white students, at his initial, inappropriately adversarial Title IX meeting, along with Greenwood's acquiescence of same;

g.  The withholding of evidence, support people and accommodations from Plaintiff thereby depriving him of his right to defend himself, while providing the white complainant with full access to the available evidence, multiple support people and numerous accommodations;

h.  Defendants honoring at all times the undue authority that McDonnell, Liston, Complainant and their witnesses gave themselves as white individuals over Plaintiff as a Black male by overlooking extensive inconsistencies in all of the white students' statements and allowing them to undermine the integrity and confidentiality of the school's investigation.

i.  The complete acceptance of the white female Complainant's allegations as true, and deeming her more credible than Plaintiff, as a Black male, despite complainant's obvious lack of credibility as demonstrated by her inconsistent, unsupported and contradictory allegations, which were blatantly false, and discredited by available evidence;

j.  The lack of meaningful investigation into Complainant's bogus allegations for fear of uncovering even more exculpatory evidence, in both the professionalism and Title IX proceedings, as well as the complete lack of notice of the allegations, and willful ignoring of procedural safeguards meant to protect Plaintiff's due process rights;

k.  The abhorrent, disrespectful and patently racist mistreatment of Plaintiff through every step of both sham proceedings, including but not limited to: (i) the dismissive nature in which each of the Defendants, campus police officers and all agents of UMMC, ignored and stonewalled Plaintiff as he desperately attempted to file police reports, obtain extensive information he was entitled to and defend himself utilizing the already limited rights available to him; (ii) the blatant lies told to Plaintiff by Clark, Williams, campus police, Greenwood and McClendon in order to slow the process down, or otherwise hinder Plaintiff's ability to defend himself; (iii) the incorrigible, intentional treatment of Plaintiff as a violent, dangerous sexual predator at each official meeting, where armed campus police officers attended each hearing so the panel members and decision makers would believe Plaintiff was a threat to them and a danger to the UMMC community; (iv) the disrespectful, rude and immature treatment of Plaintiff by the associate attorneys from UMMC's general counsel's

office, at each of Plaintiff's meetings, and both appeal hearings, neither of which required counsels' presence; and (v) the "show of force" appearances at the Title IX appeal hearing which was obviously performed to intimidate Plaintiff;

l.     Finding Plaintiff responsible and expelling him despite a clear lack of credibility from the Complainant and a complete lack of evidence to corroborate her story at the bogus professionalism hearing and the sham Title IX proceeding, which was only conducted to retroactively justify the prior insufficient professionalism dismissal;

m.     Defendants' extensive history of systemic racism as discussed herein, the disproportionate discipline of Black students as compared to their white counterparts, who receive lesser sanctions for similar conduct, and the repeated instances of racist behavior by students and powerful donors alike as well as the well-known trope of one first-year, Black medical student being sent home for unsubstantiated professionalism charges each year and the underrepresentation of Black students at UMMC, despite the PR-driven puff pieces bragging of UMMC's commitment to social justice in medicine.

381.    Upon information and belief, Defendants' expressed bias permeated Plaintiff's professionalism hearing and Title IX investigation, resulting in Plaintiff's dismissal.

382.    Defendants' actions were motivated by racial animus and were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Plaintiff's rights as guaranteed by 42 U.S.C. § 1981.

383.    As a direct and foreseeable and proximate result of Defendants' intentional illegal racial discrimination, Plaintiff has suffered damages, including punitive damages, in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the aforementioned injunctive relief directing UMMC, and Woodward, to clear Plaintiff's record of any findings of responsibility.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Violation of Title VI of the Civil Rights Act of 1964
### (Against Defendants UM, Board of Trustees and UMMC)

384.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

385.     Title VI forbids any person or institution which receives federal funds to discriminate on the basis of race, color, or national origin.  Title VI claims can be predicated on discriminatory intent, however intentional discrimination can also be inferred by the defendant's deliberate indifference to different treatment.  *Watson ex rel Watson v. Jones Cty. School District*, 2008WL4279602 (S.D. Miss. Sept. 11, 2008).

386.     UM, as a public university established by the state of Mississippi, and UMMC, as an extension of UM, receive federal funds.

387.     Plaintiff was exposed to racial discrimination as a Black male who received different treatment on account of his race in the sham disciplinary proceedings which led to his expulsion.

388.     The allegations of racial discrimination, as well as the damages caused by same, are recited in the preceding paragraphs for the Third Cause of Action.  Each and every allegation of the Third Cause of Action hereinabove is repeated and re-alleged as if fully set forth herein.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972: Erroneous Outcome
### (Against Defendant UMMC)

389.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

390.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

391.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendants University of Mississippi and UMMC.

392.    Title IX is enforceable through a private right of action.

393.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

394.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment" and "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence." Dep't of Ed., Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX (Jan. 19, 2001), at 20.

395.    To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (1) a flawed proceeding, which (2) led to an erroneous outcome; and (3) gender was a motivating factor.

396.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding and erroneously found to be responsible for sexual assault which he did not commit, and gender was a motivating factor behind this erroneous outcome.

397.   The professionalism proceedings were flawed and caused an erroneous outcome because, by way of example and not limitation:

      a.     Providing Plaintiff with no notice of the charges against him;

      b.     Failing to engage in any genuine investigation into the professionalism charges, but rather taking the complainants' stories at face value

      c.     Meeting, in private, to determine Plaintiff's responsibility without providing Plaintiff an opportunity to defend himself;

      d.     Immediately dismissing Plaintiff without proper notice;

      e.     Failing to allow Plaintiff to submit exculpatory evidence and provide the names of witnesses;

      f.     Failing to provide Plaintiff with a hearing until the appeal hearing, after he had already been expelled by the Dean's Council;

      g.     Allowing the determination of expulsion to be effectuated by individuals biased against Plaintiff as the male respondent, as said individuals are guided by feminist ideology, a desire to generate federal grant money by increasing the amount of reporting, investigating, adjudicating and sanctioning sexual misconduct by male respondents;

      h.     Allowing the same biased decision makers to also serve as the appeals panel that determined Plaintiff's appeal, thereby rubberstamping their own decision and precluding Plaintiff a fair opportunity to have his appeal considered;

      i.     Intentionally withholding exculpatory evidence from the professionalism appeal hearing and only presenting information that was detrimental to Plaintiff;

      j.     Manipulating the flow of information to the appeals panel;

      k.     Failing to provide Plaintiff with the evidence to be presented to the appeals panel until the night before the appeal hearing;

      l.     Directing the campus police to delay taking a report from Plaintiff until after he was expelled;

      m.     Failing to provide Plaintiff with the opportunity to cross-examine or submit questions to witnesses despite the possible sanction of expulsion and the issues of the complainants' credibility;

n.  Failing to apply the preponderance of the evidence standard and finding Plaintiff responsible despite a lack of evidence.

398.  The Title IX proceedings were flawed and caused an erroneous outcome because, by way of example and not limitation:

a.  Allowing McClendon to serve as the Title IX investigator, despite her clear bias against males;

b.  Engaging in a single-investigator model wherein McClendon both investigated and adjudicated the complaint against Plaintiff;

c.  Failing to investigate any Plaintiff's witnesses;

d.  Failing to ensure a fair, impartial, and through investigation, conducted in a timely manner;

e.  Meeting with the Complainant three times, as opposed to Plaintiff's single meeting;

f.  Failing to provide Plaintiff with the opportunity to discuss all of the charges at his meeting with McClendon;

g.  Including new allegations into the final investigation report which Plaintiff had no notice of and did not have an opportunity to respond to;

h.  Excluding exculpatory evidence from the report and manipulating evidence to support Complainant's story;

i.  Finding Plaintiff responsible for the Title IX charges without a hearing;

j.  Failing to provide Plaintiff with a hearing until the Title IX appeal hearing, after he had already been found responsible;

k.  Withholding evidence from Plaintiff in advance of the hearing;

l.  Allowing McClendon to serve as both the "prosecutor" and Complainant's advocate during the Title IX appeal hearing;

m.  Failing to give Plaintiff the opportunity to refute all of the allegations Complainant made at the Title IX hearing;

n.  Failing to provide Plaintiff with the opportunity to cross-examine witnesses or submit questions to witnesses, despite the possible sanction of expulsion and the issues of witness credibility;

o.      Failing to apply the preponderance of the evidence standard and finding Plaintiff responsible despite a lack of evidence;

p.      Failing to provide Plaintiff with an impartial hearing in which his appeal could be fairly considered;

q.      Subjecting Plaintiff to a Title IX investigation and adjudication despite the fact that he had already been dismissed on professionalism charges based on the same conduct, thereby constituting a form of double jeopardy;

r.      Upholding the finding of responsibility at the Title IX hearing despite clear evidence to the contrary and the acknowledgement that Complainant fabricated sexual assault allegations.

399.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings, and/or the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

a.      Beginning in 2014 with added pressure from nation-wide OCR investigations and through the time when Complainant's complaint was investigated, the University of Mississippi was subject to immense federal, local and campus pressure to take measures to protect female victims of sexual assault and issue more severe sanctions to those found responsible for sexual misconduct;

b.      Internal pressure from the student body and/or media after years of harshly criticizing the University for its alleged failure to sufficiently prosecute and punish male students and faculty accused of sexual misconduct;

c.      The institutionalized bias embracing gender stereotypes, such as female victims and male assailants, as evidenced by the University's various events focused solely on female victimization;

d.      Providing support services to female complainant throughout the Title IX investigation and hearing, while refusing to provide accommodations for male respondents;

e.      Interviewing female complainant directly after report was made, but waiting an entire week to interview Plaintiff, treating the male student's notification and interview as an afterthought, unnecessary to the evidence-gathering process and their decision to pursue a formal Title IX investigation.

f.      Selectively editing evidence in order to make the evidence corroborate Complainant's story and the determinations of responsibility;

g.    Withholding evidence from Plaintiff throughout the investigation and prior to both appeal hearings;

h.    Refusing to let Plaintiff present a full defense at the hearing, cutting his time short while letting the Complainant spend hours on her testimony;

i.    McClendon's public statements demonstrating a clear bias against males.

400.    Moreover, the Title IX investigation was outside of the University's jurisdiction. Plaintiff had already been dismissed on professionalism charges by the time the Title IX investigation was initiated. Therefore, Plaintiff was no longer a "student" as is required to be within the scope of the Policy.

401.    On information and belief, the Title IX investigation was undertaken in an effort to justify the initial professionalism dismissal, which was decided without due process and without sufficient evidence.

402.    On information and belief, UMMC's mishandling of the Complainant's complaint was informed by institutional, systemic gender bias, as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds. Indeed, McClendon had even previously stated that there was a loss of federal funds.

403.    On information and belief, the University of Mississippi is in possession of disciplinary records and statistics that show disproportionate enforcement of the conduct policy against male students.

404.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

405.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

406.    As a result, Plaintiff is entitled to damages, including punitive damages, in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the aforementioned injunctive relief directing UMMC, and Woodward, to clear Plaintiff's record of any findings of responsibility.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**42 U.S.C. §1985: Conspiracy to Violate Civil Rights**
**(Against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and**
**Woodward, individually and in their official capacities)**

407.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

408.    42 U.S.C. §1985(3) prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws."

409.    To successfully demonstrate a claim under §1985, a plaintiff must show "(1) a conspiracy between two or more people; (2) for the purpose of depriving a person or class of people of the equal protection of the laws or of equal privileges and immunities under the laws; and (3) an act committed in furtherance of the conspiracy that injures a person or deprives him of a right or privilege of a citizen of the United States." *Brown v. N. Panola Sch. Dist.*, No. 2:09CV102-SA-SAA, 2010 WL 3001914, at *8 (N.D. Miss. July 28, 2010), aff'd, 420 F. App'x 399 (5th Cir. 2011).

410.    Defendants Clark, Williams, McClendon, Greenwood, Ray and Hospodor formed a conspiracy to discriminate against Plaintiff on the basis of his race, thereby depriving him of equal protection of the laws.

411.    Defendants orchestrated a professionalism and Title IX disciplinary process replete with procedural errors with the intent to dismiss Plaintiff from UMCC.

412.    Defendants worked in concert amongst each other as well as with the University police department to alter and omit evidence in an effort to find Plaintiff responsible for sexual harassment and dismiss him from UMCC for having a relationship with a white woman.

413.    By discriminating against Plaintiff on the basis of his Black race, Defendants demonstrated a class-based animus behind their conspiracy.

414.    Defendants acted in furtherance of the conspiracy when they, by way of example and not limitation:

      a.     Dismissing Plaintiff without proper notice;

      b.     Removing Plaintiff from campus;

      c.     Ordering the barricade between Plaintiff and Complainant;

      d.     Conducting an unlawful search and seizure of Plaintiff after he was assaulted by Sam and Karam;

      e.     Destroying exculpatory video footage;

      f.     Dismissing Plaintiff without affording Plaintiff an opportunity to defend himself;

      g.     Withholding evidence before the professionalism and Title IX appeal hearings;

      h.     Failing to provide evidence to Plaintiff until the night before the hearing;

      i.     Attempting to justify the dismissal via the University police investigation, in spite of the fact that Plaintiff had not been interviewed by the University police;

j.       Altering evidence, by omitting text messages which showed mutual affection between the Complainant and Plaintiff;

k.       Finding Plaintiff responsible for sexual harassment despite a clear lack of evidence supporting the finding;

l.       Knowingly ignoring and violating the constitutional, and UMMC policy, protections Plaintiff was entitled to, in the manner described in the above Causes of Action and allegations, because of Defendants' racial animus towards Plaintiff, as a Black male.

415.    As demonstrated above, Defendants' actions were motivated by racial animus and were taken in malicious, willful, wanton, deliberate indifference to, and reckless disregard of Plaintiff's rights as guaranteed by 42 U.S.C. § 1981.

416.    As a direct and foreseeable and proximate result of Defendants' intentional illegal racial discrimination, Plaintiff has suffered damages, including punitive damages, in an amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as the aforementioned injunctive relief directing UMMC, and Woodward, to clear Plaintiff's record of any findings of responsibility.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

i.       On the First Cause of Action for violation of 42 U.S.C. § 1983, Procedural Due Process, a judgment against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward, awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants, UMMC and Woodward specifically, to: (i) reverse the findings and sanction regarding the professionalism panel adjudication as well as Jane Roe's

Title IX complaint; (ii) expunge Plaintiff's disciplinary record of all findings; (iii) remove any record of Plaintiff's expulsion from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of the professionalism panel adjudication and Jane Roe's Title IX complaint, as well as any record of Liston and McDonnell's complaints; (v) immediately reinstate Plaintiff as an enrolled student in good standing at UMMC; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record, professionalism adjudication and/or Title IX file may have been disclosed;

ii.  On the Second Cause of Action for violation of 42 U.S.C. § 1983, Substantive Due Process, a judgment against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward, awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants, UMMC and Woodward specifically, to: (i) reverse the findings and sanction regarding the professionalism panel adjudication as well as Jane Roe's Title IX complaint; (ii) expunge Plaintiff's disciplinary record of all findings; (iii) remove any record of Plaintiff's expulsion from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of the professionalism panel adjudication and Jane Roe's Title IX complaint, as well as any record of Liston and McDonnell's complaints; (v) immediately reinstate Plaintiff as an enrolled student in good standing at UMMC; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record, professionalism adjudication and/or Title IX file may have been disclosed;

iii. On the Third Cause of Action for discrimination based on race under 42 U.S.C. § 1981, a judgment against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward, awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants, UMMC and Woodward specifically, to: (i) reverse the findings and sanction regarding the professionalism panel adjudication as well as Jane Roe's Title IX complaint; (ii) expunge Plaintiff's disciplinary record of all findings; (iii) remove any record of Plaintiff's expulsion from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of the professionalism panel adjudication and Jane Roe's Title IX complaint, as well as any record of Liston and McDonnell's complaints; (v) immediately reinstate Plaintiff as an enrolled student in good standing at UMMC; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record, professionalism adjudication and/or Title IX file may have been disclosed;

iv.  On the Fourth Cause of Action for violation of Title VI of the Civil Rights Act of 1964, a judgment against Defendants UM, the Board of Trustees and UMMC awarding Plaintiff damages in an amount to be determined at trial, plus punitive

90

damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants, UMMC and Woodward specifically, to: (i) reverse the findings and sanction regarding the professionalism panel adjudication as well as Jane Roe's Title IX complaint; (ii) expunge Plaintiff's disciplinary record of all findings; (iii) remove any record of Plaintiff's expulsion from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of the professionalism panel adjudication and Jane Roe's Title IX complaint, as well as any record of Liston and McDonnell's complaints; (v) immediately reinstate Plaintiff as an enrolled student in good standing at UMMC; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record, professionalism adjudication and/or Title IX file may have been disclosed;

v.   On the Fifth Cause of Action for violation of Title IX of the Education Amendments of 1972, Erroneous Outcome, a judgment against UMMC awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants, UMMC and Woodward specifically, to: (i) reverse the findings and sanction regarding the professionalism panel adjudication as well as Jane Roe's Title IX complaint; (ii) expunge Plaintiff's disciplinary record of all findings; (iii) remove any record of Plaintiff's expulsion from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of the professionalism panel adjudication and Jane Roe's Title IX complaint, as well as any record of Liston and McDonnell's complaints; (v) immediately reinstate Plaintiff as an enrolled student in good standing at UMMC; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record, professionalism adjudication and/or Title IX file may have been disclosed;

vi.   On the Sixth Cause of Action for Conspiracy to violate Civil Rights under 42 U.S.C. § 1985, a judgment against Defendants Clark, Williams, McClendon, Greenwood, Ray, Hospodor and Woodward awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants, UMMC and Woodward specifically, to: (i) reverse the findings and sanction regarding the professionalism panel adjudication as well as Jane Roe's Title IX complaint; (ii) expunge Plaintiff's disciplinary record of all findings; (iii) remove any record of Plaintiff's expulsion from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of the professionalism panel adjudication and Jane Roe's Title IX complaint, as well as any record of Liston and McDonnell's complaints; (v) immediately reinstate Plaintiff as an enrolled student in good standing at UMMC; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record, professionalism adjudication and/or Title IX file may have been disclosed; and,

vii.       Such additional, other, or further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues so triable in this action.

Dated:    Jackson, Mississippi
          March 20, 2021

                                    **Respectfully submitted,**

                                    **Nesenoff & Miltenberg LLP**
                                    ***Attorneys for Plaintiff John Doe***

                                    By: /s/  Nicholas E. Lewis, Esq.
                                    Nicholas Lewis, Esq., *pro hac vice*
                                    *admission pending*
                                    Andrew T. Miltenberg, Esq., *pro hac vice*
                                    *admission pending*
                                    363 Seventh Avenue, 5th Floor
                                    New York, New York 10001
                                    212-736-4500 (telephone)
                                    212-736-2260 (fax)
                                    amiltenberg@nmllplaw.com
                                    nlewis@nmllplaw.com

                                    /s/ Joel F. Dillard
                                    Joel F. Dillard, PA (MS 104202)
                                    775 N. Congress St.
                                    Jackson MS 39202
                                    601-509-1372 (phone and fax)
                                    joel@joeldillard.com